The CLEVELAND ELECTRIC ILLUMI-
NATING COMPANY, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY et al., Respondents.

Nos. 77–3085, 77–3160.

United States Court of Appeals,
Sixth Circuit.

Argued April 12, 1979.

Decided Aug. 6, 1979.

Michael L. Hardy, Guren, Merritt, Sogg
& Cohen, Donald H. Hauser, William J.
Kerner, Cleveland, Ohio, for petitioner.

Barry L. Malter, Gen. Counsel, Environ-
mental Protection Agency, Peter R. Taft,
Alfred T. Ghiorzi, Michael P. Carlton, Allen
H. Sachsel, Dept. of Justice, Pollution Con-
trol Section, Washington, D. C., for respon-
dents.

Before LIVELY and KEITH, Circuit
Judges, and PECK, Senior Circuit Judge.

LIVELY, Circuit Judge.

In this case we consider a petition for review of action of the United States Environmental Protection Agency (U.S. EPA) under the Federal Water Pollution Control Act Amendments of 1972, Pub.L. 92–500, 86 Stat. 816, codified at 33 U.S.C. § 1251 *et seq.* (1972 Amendments). The particular question for review is whether U.S. EPA[1] acted lawfully in rejecting a proposed permit for The Cleveland Electric Illuminating Company (CEI) to discharge effluents into navigable waters in Ohio. The permit was proposed by the Ohio Environmental Protection Agency (Ohio EPA), but was withdrawn when U.S. EPA objected in writing. We grant the petition for review, vacate the action of U.S. EPA and remand for further proceedings.

## I.

The goals and policy of Congress in enacting the 1972 Amendments are clearly stated in § 101(a)[2] which begins: "The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." As the means of achieving this objective Congress adopted as a national goal the elimination of all discharges of pollutants into the navigable waters of the nation by 1985. To this end all such discharges are declared illegal unless made in compliance with provisions of the statute.

Recognizing the magnitude of its undertaking, Congress provided for reduction of discharges by reference to the development of technology for controlling and eliminating the discharge of pollutants. Thus, section 301 of the 1972 Amendments[3] establishes a two-stage plan for meeting an interim goal of water quality to be achieved by July 1, 1983. Under this timetable, no later than July 1, 1977, effluent limitations are required to be achieved for all "point sources [facilities or installations which emit pollutants] which shall require the application of the best practicable control technology currently available" as defined by U.S. EPA. § 301(b)(1)(A). This requirement is referred to as BPT. The second stage is to be achieved no later than July 1, 1983. By that time effluent limitations are required to be achieved for all "categories and classes of point sources . . . which [ ] shall require application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants," as determined in accordance with regulations of U.S. EPA. § 301(b)(2)(A). This requirement is referred to as BAT.

One of the methods devised by Congress for achieving the ultimate goal of the 1972 Amendments involves the issuance of permits to dischargers who meet the BPT and BAT requirements. This permit program is referred to as the National Pollutant Discharge Elimination System (NPDES). § 402.[4] The permits under NPDES are issued by U.S. EPA unless a particular state has established a permit program which meets the requirements of the statute. If a state establishes an approved permit system, U.S. EPA no longer issues permits with respect to the navigable waters subject to the state program. § 402(c). However, each state is required to send U.S. EPA a copy of each permit application and to notify it of each permit which the state proposes to issue. If U.S. EPA objects in writing within 90 days on grounds that a proposed permit is outside the guidelines and requirements of the 1972 Amendments the permit may not be issued. § 402(d).

The effluent limitations applicable to steam electric generating plants are contained in 40 C.F.R. Part 423. Effluent limitations effective July 1, 1977 to be attained by application of BPT are set forth as

---

1. Though the statute refers to actions by the Administrator of the Environmental Protection Agency, throughout this opinion reference will be to acts of the agency.

2. 33 U.S.C. § 1251(a).

3. 33 U.S.C. § 1311.

4. 33 U.S.C. § 1342.

guidelines in 40 C.F.R. § 423.12. Those to be attained no later than July 1, 1983 by application of BAT are established by the guidelines contained in 40 C.F.R. § 423.13. Both sections contain "variance provisions." As originally promulgated by U.S. EPA the variance provision of § 423.12(a), with which this opinion is concerned, read as follows:

(a) In establishing the limitations set forth in this section, EPA took into account all information it was able to collect, develop and solicit with respect to factors (such as age and size of plant, utilization of facilities, raw materials, manufacturing processes, non-water quality environmental impacts, control and treatment technology available, energy requirements and costs) which can affect the industry subcategorization and effluent levels established. It is, however, possible that data which would affect these limitations have not been available and, as a result, these limitations should be adjusted for certain plants in this industry. An individual discharger or other interested person may submit evidence to the Regional Administrator (or to the State, if the State has the authority to issue NPDES permits) that factors relating to the equipment or facilities involved, the process applied, or such other factors related to such discharger are fundamentally different from the factors considered in the establishment of the guidelines. On the basis of such evidence or other available information, the Regional Administrator (or the State) will make a written finding that such factors are or are not fundamentally different for that facility compared to those specified in the Development Document. If such fundamentally different factors are found to exist, the Regional Administrator or the State shall establish for the discharger effluent limitations in the NPDES permit either more or less stringent than the limitations established herein, to the extent dictated by such fundamentally different factors. Such limitations must be approved by the Administrator of the Environmental Protec-

tion Agency. The Administrator may approve or disapprove such limitations, specify other limitations, or initiate proceedings to revise these regulations.

## II.

Prior to the enactment of the 1972 Amendments, acting under existing law, CEI applied to the Army Corps of Engineers for permits to discharge pollutants from four of its steam generating plants. The applications were not acted upon before the effective date of the 1972 Amendments and accordingly were considered to have been filed under the new statute. When U.S. EPA approved Ohio's program for issuing NPDES permits the applications of CEI were transmitted to Ohio EPA. Proposed permits were prepared by Ohio EPA and forwarded to U.S. EPA. However, CEI requested an adjudication hearing on these permits and the proceedings returned to Ohio EPA.

The major pollutant which CEI discharges is burned coal residue consisting of bottom ash and fly ash. Ash laden water is pumped into ponds and lagoons where the ash solids eventually settle to the bottom. The ponds are cleaned out periodically and the sediment is disposed of at an off-site landfill. However, there is overflow from these settling ponds and the guidelines and standards require that the solids stay in the ponds long enough to settle completely before water flows out. The four generating plants of CEI are located in an urban area on relatively small sites. CEI successfully contended before Ohio EPA that these sites do not contain enough unoccupied space to permit enlargement of the settling ponds to a sufficient degree to meet the July 1, 1977 standards of adequate settling time. Following lengthy informal proceedings CEI and Ohio EPA entered into "consent agreements" with respect to each of CEI's four generating plans in October 1976.

The consent agreements contained findings, *inter alia*, that even though CEI had installed equipment not required by applicable regulations which had significantly reduced total suspended solids in discharges

from the ash ponds and clarifiers, "the existing ponds and clarifiers are incapable of providing adequate retention time and pond stability to comply with certain 1977 standards." The Ohio EPA issued final orders with each consent agreement. These orders were to be issued as NPDES permits if approved by the U.S. EPA. The orders were based on findings that while CEI had been able to attain compliance with a number of the July 1, 1977 effluent limitations based on application of best practicable control technology, it would not be able to achieve compliance with all of these limitations because of site-specific factors despite its good faith efforts. The Ohio EPA also found that CEI would be able to accelerate compliance with the BAT standards of July 1, 1983 and actually meet those requirements during 1980 if permitted to satisfy alternative effluent limitations between 1977 and 1980. There was no written finding that the factors considered by the Ohio EPA were or were not "fundamentally different for that facility compared to those specified in the Development Document." § 423.12(a), *supra*.

The Ohio EPA orders were rejected as NPDES permits by U.S. EPA "because the dates for compliance with final limitations required to achieve best practicable control technology (BPT) or water standards extend beyond July 1, 1977 in violation of Section 301 of the Act . . . ." Noting that proposed construction schedules extended into 1980, U.S. EPA stated, "This is particularly disturbing since the company may be putting itself in the position where at the completion of construction to meet BPT requirements it would have to start immediately to redesign and construct new or additional facilities to meet the 1983 Best Available Treatment (BAT) requirements."

### III.

In seeking review of U.S. EPA's refusal to approve the proposed permits, CEI contends that it produced evidence during the informal proceedings which supports the findings of Ohio EPA that certain effluent limitations contained in the final guidelines are "inappropriate" for its generating facilities. It asserts that certain "unique, insoluble" problems made it impossible to comply with some of the limitations by July 1, 1977. These conditions all relate to the size of the sites of the four generating plants, approximately 100 acres each. According to CEI, while these sites are not large enough to permit expansion of its settling basins to a degree required to meet the BPT limitations, by accelerating installation of a "recycle system" it will be able to meet the more stringent BAT limitations approximately three years before the compliance date of July 1, 1983. CEI argues that Ohio EPA was authorized to grant a permit which contained alternative effluent limitations, because the structure of the 1972 Amendments ensures sufficient flexibility to permit variances for site-specific conditions.

It is CEI's position that the determination of effluent limitations based on application of BPT as contained in the guidelines is only "presumptively applicable" to any particular installation. CEI argues that conditions vary greatly from plant to plant and that each operator is entitled to show that particular limitations should not be applied to its plant because of conditions peculiar to it. Further, the permit-issuing agency (here Ohio EPA) has authority to make this determination. CEI contends that the effect of the Ohio EPA order was to grant variances for the four plants, as permitted by law, and that it was unlawful for U.S. EPA to deny approval.

U.S. EPA supports its action on the basis of its determination that the proposed permits were clearly outside the guidelines. It argues that the effluent limitations are final and binding on all power plant operators in the absence of a variance and that no variance was obtained by CEI. It further contends that the "Development Document for Effluent Limitations Guidelines" shows that the question of the amount of land needed for disposal of burned coal residues was carefully considered in promulgating the regulations. After such consideration U.S. EPA concluded that "special

consideration of land needs was unwarranted because treatment technology includes small-sized configurated equipment as well as lagoon type facilities." Thus, asserts U.S. EPA, the size of a plant site is not a "fundamentally different factor []" which would render a particular generating plant atypical from those considered in the Development Document. The existence of fundamentally different factors is the only basis for a variance under 40 C.F.R. § 423.-12(a), *supra.* Further, CEI never attempted to obtain a variance or to prove the existence of fundamentally different factors, according to U.S. EPA. In effect, U.S. EPA contends that the only variance procedure available to a discharger is that described in § 423.12(a). It argues that this procedure provides sufficient flexibility to protect a discharger with unique problems from an otherwise unfair application of the general effluent limitations.

On the other hand, CEI asserts that the variance provisions of § 423.12(a) were invalidated by the Fourth Circuit in *Appalachian Power Co. v. Train,* 545 F.2d 1351 (1976). This occurred while it was engaged in informal negotiations with Ohio EPA. Thus CEI contends that there were no prescribed criteria for granting variances when Ohio EPA determined that some of the BPT limitations were inappropriate for its four installations. Under these circumstances, argues CEI, it was within the authority of Ohio EPA to issue permits on the basis of the record before it.

## IV.

### A.

Though various questions have been decided under the 1972 Amendments, there appears to be no case which has dealt with the precise issue now before this court. In *E. I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977), the Supreme Court discussed the 1972 Amendments and specifically held that U.S. EPA had authority under the statute to issue regulations which established uni-

form effluent limitations for categories of plants. *Id.* at 136, 97 S.Ct. 965. The Court pointed out that even though the July 1, 1977 limitations in § 301 refer to point sources rather than categories and classes, such limitations could lawfully be established by general regulation "so long as some allowance is made for variations in individual plants, as EPA has done by including a variance clause in its 1977 limitations." *Id.* at 128, 97 S.Ct. at 975.

In *Appalachian Power Co. v. Train, supra,* the court of appeals emphasized the importance of variance provisions where regulations are presumptively applicable nationwide. In setting aside 40 C.F.R. § 423.12(a) and remanding to U.S. EPA for further consideration, the court found the requirement that there be a showing of fundamentally different factors to be "unduly restrictive." 545 F.2d at 1359. U.S. EPA did not seek review of this holding. Instead, more than eight months after the decision was rendered U.S. EPA made a motion to recall the mandate and modify the decision. This motion was denied. It is clear that the only variance provision promulgated by U.S. EPA with respect to BPT limitations was inoperative at the time Ohio EPA completed consideration of CEI's application for partial relief from the BPT limitations.

### B.

There can be no doubt that U.S. EPA remains the dominant agency for achieving the purposes and goals of the 1972 Amendments even after a state permit program has been approved. § 402(d)(2).[5] As the Supreme Court pointed out in *EPA v. State Water Resources Control Board,* 426 U.S. 200, 208, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), no permit may be issued where U.S. EPA objects on the ground that issuance would be "outside the guidelines and requirements" of the statute. See also, *American Meat Institute v. EPA,* 526 F.2d 442, 452 (7th Cir. 1975). We must determine in this case whether the action of U.S. EPA, though taken within the scope of its

5. 33 U.S.C. § 1342(d)(2).

authority, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act, § 10(e), 5 U.S.C. § 706(2)(A) (1976). Without attempting to substitute our judgment for that of the agency, we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (citations omitted).

### V.

More than a year after the Fourth Circuit denied the agency's motion to recall the mandate in *Appalachian Power*, U.S. EPA sought to comply with the requirements of that decision by amending 40 CFR Part 423 with the addition of the following two sentences at the end of § 423.12(a):

> * * * In accordance with the decision in *Appalachian Power Co. v. Train*, 545 F.2d 1351, 1358–60 (4th Cir. 1976), EPA's legal interpretation appearing at 39 FR 30073 (1974) shall not apply to this paragraph. The phrase "other such factors" appearing above may include significant cost differentials and the factors listed in section 301(c) of the Act. 43 Fed.Reg. 44848 (1978).

The significance of this amendment, for purposes of this case, is the explicit inclusion in "other such factors" to be considered as justification for a variance from BPT requirements of a new standard previously applicable only to BAT permits. Section 301(c) provides:

**(c) Modification of timetable**

The Administrator may modify the requirements of subsection (b)(2)(A) of this section with respect to any point source for which a permit application is filed after July 1, 1977, upon a showing by the owner or operator of such point source satisfactory to the Administrator that such modified requirements (1) will represent the maximum use of technology within the economic capability of the owner or operator; and (2) will result in

reasonable further progress toward the elimination of the discharge of pollutants. Though section 301(c) refers to applications filed after July 1, 1977 and allows the modification of a timetable for BAT compliance, the amendment to 40 C.F.R. § 423.12(a) made the factors listed in § 301(c) applicable to variances from BPT limitations requirements as well. One of these factors is that modified requirements "will result in reasonable further progress toward the elimination of the discharge of pollutants."

Ohio EPA proposed to issue permits which allowed partial exemption from the BPT requirements for two reasons: (1) the limited size of the sites on which the four CEI units were located made full achievement of the July 1, 1977 limitations by application of BPT impracticable, and (2) by foregoing attainment of some of the 1977 limitations and proceeding immediately to construction and installation of facilities required to reach BAT limitations, the more stringent BAT requirements would be met in 1980, approximately 3 years before the date required by the 1972 Amendments.

■ When U.S. EPA acted on the Ohio EPA proposal there was no variance procedure for electric generating units because 40 C.F.R. § 423.12(a) as adopted in 1974 had been set aside in *Appalachian Power Co., supra*, and no replacement had been adopted. The effect of the Ohio EPA proposed permit was to grant a variance based on plant-specific factors. In its brief before this court U.S. EPA argued that since Ohio EPA did not make an explicit finding that fundamentally different factors existed at CEI's plants, U.S. EPA was not required to consider its factual findings and orders. We believe that U.S. EPA failed to consider all of the relevant factors and committed a clear error of judgment. *Citizens to Preserve Overton Park, supra*. Under a statutory scheme which gives initial authority to a state agency, subject to approval of its recommendations by a federal agency, considerations of comity require the reviewing agency to consider the findings of the initiating agency. This arbitrary determination by U.S. EPA is completely unsupport-

able, particularly in view of the finding of the court of appeals in *Appalachian Power Co.* that the "fundamentally different factors" requirement is "unduly restrictive. 545 F.2d at 1359.

More significant than U.S. EPA's failure to consider Ohio EPA' findings because they did not refer to "fundamentally different" factors is its failure to consider the finding that CEI would achieve BAT requirements three years in advance of the statutory deadline if permitted to adopt alternate BPT limitations and accelerate installations required to achieve BAT limitations. As noted earlier in this opinion, U.S. EPA in vetoing the proposed permits, commented on the possibility of CEI's being required to begin immediately to redesign and construct new facilities at completion of construction to meet BPT requirements. This comment indicates that U.S. EPA failed either to consider or to comprehend fully an important finding of Ohio EPA which it viewed as a critical element of its recommendation that CEI be permitted to comply with alternative effluent limitations between 1977 and 1980.

We conclude that CEI is entitled to have the proposed NPDES permits considered under the amended regulation. In considering these proposed permits U.S. EPA must give due regard to the findings of Ohio EPA. In view of the fact that the BPT standard is the first of two interim requirements—the second being the more stringent BAT standard—U.S. EPA must consider the finding that CEI will be able to attain the BAT limitations some three years prior to the statutory deadline if exempted from compliance with a portion of the 1977 limitations.

■ The ultimate justification for every regulation and guideline pertaining to discharges is its effectiveness in promoting the achievement of the goals of Congress in enacting the 1972 Amendments. The primary goal is restoration of the navigable waters of the nation to a condition of "chemical, physical, and biological integrity." § 101(a). Upon remand U.S. EPA is to consider whether this goal is better served by permitting CEI to accelerate its achievement of BAT limitations rather than requiring it to follow a sequential pattern by first complying with all BPT limitations.

The petition for review is granted. The action of U.S. EPA declining to approve the NPDES permits proposed by Ohio EPA is vacated and the cause is remanded to U.S. EPA for further proceedings consistent with this opinion.