# Removal of Members of the
## Advisory Council on Historic Preservation

Congress did not intend to limit the President's power to remove members of the Advisory Council on Historic Preservation without cause prior to the expiration of their terms of office. While certain of the Council's structural attributes and substantive functions suggest that Congress intended to vest the Council with a measure of day-to-day independence from other federal agencies, this does not mean that it intended the Council to operate free of the supervision and control of the President himself through his exercise of the removal power.

The primary functions of the Council are executive in nature, and thus not such as would permit Congress constitutionally to insulate its members from the President's removal power; it will therefore not be inferred from Congress silence on the matter that it intended to do so.

A legislative scheme in which disputes between executive agencies are to be settled in federal or state court would raise a number of serious constitutional problems, under both Article II and Article III, and such an intent on Congress part will not be assumed absent the most compelling and unambiguous language.

March 11, 1982

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This memorandum addresses the question whether the members of the Advisory Council on Historic Preservation (Council) are removable by the President without cause prior to the expiration of their terms of office. For the reasons set forth below, we conclude that Congress did not intend the Council to operate free of the supervision and control of the President, and specifically that it did not intend to impose restraints on the President's presumptive authority to remove his appointees to the Council. We conclude in addition that the primary functions of the Council are not such as would permit Congress, consistent with the Constitution, to insulate Council members from the President's removal power.

### I. The Council

The Council was created by the 1966 National Historic Preservation Act (the Act), Pub. L. No. 89–665, 80 Stat. 915, 917, with the specific mandate of advising the President and Congress on matters relating to historic preservation, recommending measures to coordinate public and private preservation efforts, and "reviewing" federal agency actions affecting properties listed on the National Register of Historic Places. See H.R. Rep. No. 1916, 86th Cong., 2d Sess.

1 (1966). As amended in 1980 by Pub. L. No. 96–515, 94 Stat. 2987, the Act provides that the Council should be composed of 19 members, 17 of whom are appointed by the President.[1] Of the 17 presidential appointees, seven are otherwise officers of the United States: the Secretary of the Interior, the Secretary of Agriculture, and the Architect of the Capitol serve *ex officio;* the President appoints the heads of four other "agencies of the United States" whose activities affect historic preservation. The remaining ten members consist of one governor, one mayor, four experts in the field of historic preservation, three at-large members from the general public, and a chairman selected from the general public, all appointed by the President. The tenure of the federal agency heads on the Council is, we believe, dependent on their continuing service as agency heads. And, with the exception of the two members whose tenure depends in part upon state or local election results, the non-federal presidential appointees serve for terms of four years. The statute and its legislative history are silent on the matter of Council members' removal from office prior to the end of a term.[2]

The Council is established "as an independent agency of the United States Government." 16 U.S.C. § 470i. It is exempt from the Federal Advisory Committee Act, but is subject to the Administrative Procedure Act, 16 U.S.C. § 470g. It has an independent budget as a "related agency" of the Department of the Interior, 16 U.S.C. § 470t, and authority to hire its own executive director and staff, 16 U.S.C. § 470m(a). Its executive director is in turn authorized to appoint a general counsel and other staff attorneys. 16 U.S.C. § 470m(b). The Council must submit an annual report to the President and Congress, 16 U.S.C. § 470j(b), and is authorized to submit legislative recommendations and testimony directly to relevant congressional committees without prior clearance from the Office of Management and Budget. 16 U.S.C. § 470r.

Because the nature of the functions performed by an entity is an important factor in determining the constitutional limits of congressional power to restrict the President's power to remove his appointees, *see Wiener* v. *United States,* 357 U.S. 349, 353 (1958), that subject has also become a focal point in determining congressional intent concerning presidential removal power. We therefore set out the Council's duties in full in the following paragraphs.

The Council's advisory functions are described in § 202 of the Act, 16 U.S.C. § 470j. As there directed, the Council shall:

---

[1] The Chairman of the National Trust for Historic Preservation and the President of the National Conference of State Historic Preservation Officers serve on the Council *ex officio See* 16 U.S.C. § 470i(a)(7) and (8) Because these two members of the Council are not appointed by the President, they may not participate in any Council functions in which they must constitutionally act as officers of the United States, and must confine their participation in the Council's activities to those areas in which its role is purely advisory *See* letter of Dec 1, 1980, from Alan A Parker, Assistant Attorney General, to the Director, Office of Management and Budget.

[2] The discussion of the President's removal power in this memorandum applies to all of his appointees whose tenure in office is not otherwise subject to his control by virtue of their positions as officers of the United States—a group which constitutes at least ten persons, and thus a majority of the Council The President's power to remove the two Cabinet members who serve *ex officio* is unquestioned. The four other agency heads are likewise subject to presidential removal, at least in their capacity as *head* of an Executive Branch agency. Though the Architect of the Capitol is listed as a congressional officer or agent of Congress in the Congressional Directory, and is largely subject to congressional direction in the performance of his duties, he is appointed and subject to removal by the President alone. *See* letter of August 13, 1979, from Assistant Attorney General Harmon to Senator Domenici, citing an opinion of the Office of Legal Counsel dated June 1, 1953

181

(1) advise the President and the Congress on matters relating to historic preservation; recommend measures to coordinate activities of Federal, State, and local agencies and private institutions and individuals relating to historic preservation; and advise on the dissemination of information pertaining to such activities;

(2) encourage, in cooperation with the National Trust for Historic Preservation and appropriate private agencies, public interest and participation in historic preservation;

(3) recommend the conduct of studies in such areas as the adequacy of legislative and administrative statutes and regulations pertaining to historic preservation activities of State and local governments and the effects of tax policies at all levels of government on historic preservation;

(4) advise as to guidelines for the assistance of State and local governments in drafting legislation relating to historic preservation; and

(5) encourage, in cooperation with appropriate public and private agencies and institutions, training and education in the field of historic preservation;

(6) review the policies and programs of Federal agencies and recommend to such agencies methods to improve the effectiveness, coordination, and consistency of those policies and programs with the policies and programs carried out under this Subchapter; and

(7) inform and educate Federal agencies, State and local governments, Indian tribes, other nations and international organizations and private groups and individuals as to the Council's authorized activities.

16 U.S.C. § 470j(a).

In addition, under § 106 of the Act, federal agency heads are required to afford the Council "a reasonable opportunity to comment" before approving any expenditure of federal funds on, or licensing of, an undertaking which would affect properties on the National Register of Historic Places. *See* 16 U.S.C. § 470f.[3] Section 211 of the Act authorizes the Council to promulgate "such rules

---

[3] Several courts have had occasion to construe the "reasonable opportunity to comment" authority in § 106. In *WATCH* v. *Harris*, 603 F.2d 310 (2d Cir. 1979), *cert. denied*, 444 U.S 995 (1979), Judge Oakes reviewed the legislative history of § 106 and concluded that Congress intended to provide a "meaningful review" of federal or federally assisted projects which affect historic properties. 603 F.2d at 324. The Secretary of Housing and Urban Development was found to have violated § 106 in failing to consider the impact of a housing project on certain historic properties, and in failing to solicit the Council's advice. The court of appeals therefore affirmed the district court's injunction against proceeding with the project. *But see Commonwealth of Pennsylvania* v. *Morton*, 381 F. Supp. 293, 299 (D.D.C. 1974), in which the Secretary of the Interior had initially failed to consult with and subsequently failed to follow the recommendations of the Advisory Council in a matter involving a land exchange agreement and the construction of a tower on previously federal property near Gettysburg National Cemetery. The court found that the Secretary had "substantially complied" with § 106 by referring the matter to the Council for its comments after the land exchange agreement had been signed, and that "[i]f he deviated from its recommendation, the Secretary was authorized to do so in his discretion by the express terms" of 16 U.S.C. § 460l–22(b). *See* 381 F. Supp. at 298 n.7. The Council's reviewing authority under § 106 is enhanced by Executive Order 11593, 36 Fed.

Continued

182

and regulations as it deems necessary to govern the implementation" of § 106 of the Act. 16 U.S.C. § 470s.

As previously noted, the Council's executive director is authorized to appoint a General Counsel and other staff attorneys, who in turn are authorized:

> to assist the General Counsel, represent the Council in courts of law whenever appropriate, including enforcement of agreements with Federal agencies to which the Council is a party, assist the Department of Justice in handling litigation concerning the Council in courts of law, and perform such other legal duties and functions as the Executive Director and the Council may direct.

16 U.S.C. § 470m(b). The Council would appear, therefore, to be authorized to bring lawsuits under some circumstances against at least some other federal agencies.[4]

The 1980 Amendments to the Historic Preservation Act expanded the Council's authority in a new § 214, under which the Council is authorized to make rules for exempting certain federal actions from the requirements of the Act:

> The Council, with the concurrence of the Secretary, shall promulgate regulations or guidelines, as appropriate, under which Federal programs or undertakings may be exempted from any or all of the requirements of this Act when such exemption is determined to be consistent with the purposes of this Act, taking into consideration the magnitude of the exempted undertaking or program and the likelihood of impairment of historic properties.

16 U.S.C. § 470v.[5]

---

Reg. 8921 (1971), which requires that an agency proposing to "sell, demolish or substantially alter" any federally owned property which "might qualify" for nomination to the National Register, may take no action until the Advisory Council has been provided "an opportunity to comment." Executive Order 11593 also requires that federal agencies consult with the Council in adopting procedures to assure that their policies and programs contribute to the preservation of both federally and non-federally owned properties of historic significance See *WATCH* v *Harris*, 603 F.2d at 325

Under the 1980 Amendments to the Act, a similar "opportunity to comment" must be afforded the Council under § 110(f) of the Act whenever federal agency actions "may directly and adversely affect" any designated National Historic Landmark. *See* § 206 of Pub. L. No. 96–515, 94 Stat. 2987, 2996.

[4] The phrase "including enforcement of agreements with Federal agencies to which the Council is a party" was added to the statute in 1980 *See* § 301(i) of Pub. L. No. 96–515, 94 Stat. at 2999. While no reference to them appears elsewhere in the Act, the legislative history of the 1980 Amendments suggests that the referenced "agreements" are those described in the Council's regulations in Part 800 of Title 36, Code of Federal Regulations *See* 36 C.F.R. § 800.6(c) (Memorandum of Agreement). *See also* H.R Rep. No. 1457, 96th Cong., 2d Sess. 42 (1980) (1980 House Report) ("specifically added is language that refers to the enforcement of agreements with Federal agencies under Section 106, other authorities contained in this Act and implementing regulations"). The agreements are entered into by parties to the "consultation process" by which the Council carries out its commenting function under § 106 of the Act, whenever it is determined that a federal undertaking will have an adverse effect on an historic property. The agreement must "detail[] the actions agreed upon by the consulting parties to be taken to avoid, satisfactorily mitigate, or accept the adverse effects on the property." 36 C.F.R. § 800.6(c)(1). "The consulting parties" include the head of the federal agency having responsibility for the undertaking, the Historic Preservation Officer of the State involved, and the executive director of the Council. Other public and private "parties in interest" may be invited by the consulting parties to participate in the consultation process.

[5] The terms of § 214 are ambiguous with respect to the nature of the authority conferred, and have not yet been interpreted by either the Council or the courts. The rulemaking authority under § 214 clearly cannot be exercised absent prior secretarial "concurrence." Once exercised with the Secretary's concurrence, however, that authority, unlike the "opportunity to comment" requirement of § 106, appears to contemplate the establishment and enforcement of a substantive standard of conduct which will be binding on "Federal programs or undertakings" having an impact on historic properties

Finally, § 202(b) directs the Council to submit an annual report on its activities to the President and Congress, as well as any additional periodic reports that it deems advisable:

> Each report shall propose such legislative enactments and other actions as, in the judgment of the Council, are necessary and appropriate to carry out its recommendations and shall provide the Council's assessment of current and emerging problems in the field of historic preservation and an evaluation of the effectiveness of the programs of Federal agencies, State and local governments, and the private sector in carrying out the purposes of this Act.

16 U.S.C. § 470j(b).

In sum, the Council's role under the statute is primarily that of an advocate, advisor, and educator in matters relating to historic preservation, with certain ancillary responsibilities as "watchdog" over federal agencies whose activities affect historic properties.

## II. Statutory Restraints on the President's Power to Remove Council Members

At no time since the Council's establishment has Congress expressed any intent to limit presidential control over the tenure of its members. It is true that certain of the structural attributes and substantive functions described in the foregoing section suggest that Congress intended to vest the Council with a measure of day-to-day independence from other federal agencies. This does not mean, however, that Congress intended the Council to operate free of the supervision and control of the President himself through the exercise of the removal power.

With respect to the Council's structure, we do not regard a statutory description of an entity as "independent" as dispositive of the question of the President's power to remove its members. In this case, the legislative history of the Act confirms the limited sort of "independence" Congress intended for the Council. Under the 1966 Act, the Council was organizationally part of the Department of the Interior, with its budget and staff integrated into those of the National Park Service. By 1976, dissatisfaction with the limits this arrangement placed on the Council's ability to function "on an equal and independent basis," particularly in reviewing actions of the Department of the Interior under § 106 of the Act, gave rise to the amendments which reorganized the Council "as an independent agency in the Executive Branch." See § 201(5) of Pub. L. 94–422 as described in S. Rep. No. 367, 94th Cong., 1st Sess. 11 (1975) ("1975 Senate Report"). In Committee Reports and in Hearings, the Council's need for "equal and independent" status is discussed in terms of the conflicts arising from its administrative involvement with the Department of the Interior, and the resulting day-to-day pressures which had hampered the efficiency and impaired the objectivity of the Council. The change in status was effectuated, however, by nothing more

than modifying arrangements for the Council's budget and staff. *See* 1975 Senate Report at 11; *Hearings on S. 327 before the Subcommittee on Parks and Recreation of the Senate Committee on Interior and Insular Affairs (Part 3),* 94th Cong., 1st Sess. 301–05 (1975) (Statement of Clement M. Silvestro, Chairman, Advisory Council on Historic Preservation) (1975 Senate Hearings). There is no suggestion in the 1976 Amendments or their legislative history that Congress intended that the Council be insulated from the ultimate control of the President, or, in particular, that its members should no longer be subject to his power to remove them.[6] Indeed, the Council's new "independence" enhances its ability to perform its duty of advising the President apart from influence from the Department of the Interior, and strengthens the Council's direct relationship and responsiveness to the President rather than weaken them.

The statute's provisions dealing with the Council's relationship with Congress are more problematic. As noted above, the Council has since its creation been explicitly charged with advising Congress as well as the President. In addition, since § 210 was added to the Act in 1976, the Council is relieved of any requirement to submit its legislative recommendations or testimony to any "officer or agency" in the Executive Branch prior to their submission to Congress. Because this direct reporting authority may have an important bearing on the removal power of the President, it is worth quoting in full:

> No officer or agency of the United States shall have any authority to require the Council to submit its legislative recommendations, or testimony, or comments on legislation to any officer or agency of the United States for approval, comments, or review, prior to the submission of such recommendations, testimony, or comments to the Congress. In instances in which the Council voluntarily seeks to obtain the comments or review of any officer or agency of the United States, the Council shall include a description of such actions in its legislative recommendations, testimony, or comments on legislation which it transmits to the Congress.

16 U.S.C. § 470r.

On the one hand, the Council's direct access to Congress suggests a legislative intent to have its own lines of communication with the Council kept free from political or policy influence from elsewhere in the Executive Branch. On the other hand, this reporting scheme need not necessarily interfere with the President's general administrative control over the Council's activities, and as far as we are aware, it has never done so.[7] In this regard, it is significant that the 1980

---

[6] None of the structural attributes and substantive functions of the Council which might suggest a legislative intent to make its members "independent" of the President's removal power were part of the statute under the 1966 Act. Prior to 1976, therefore, there can have been no doubt that its members were removable by the President.

[7] Indeed, we question whether the statutory classification "officer or agency" in § 470r must necessarily be construed to include the President himself. Compare the definition of "officer" in § 2104 of Title 5 of the United States Code, which on its face would appear not to include the President. To the extent that a broad construction of this permissive bypass provision in the legislative reporting area would itself raise constitutional separation of powers issues, we would be inclined to read it narrowly to permit the President himself a continued supervisory role. *See Congress Construction Corp* v. *United States,* 314 F.2d 527, 530–32 (Ct. Cl. 1963) (President's power of control includes the right to supervise and coordinate all replies and comments from the Executive Branch to Congress)

185

Amendments to the Act repealed what had been the first sentence of § 210, which directed the Council's concurrent submission to Congress of any and all of its legislative recommendations to the President.[8] The present reporting scheme thus leaves the Council free to communicate with Congress directly and independently if it chooses, but does not obligate the Council to share simultaneously with Congress all or indeed any of its advice to the President. The result is a potentially strengthened tie between the Council and the President, one freed of the congressional oversight imposed by the 1976 Amendments. Congress' willingness in 1980 to give up the mandatory features of its own direct access to the Council and restore some measure of privacy to the relationship between the Council and the President, is scarcely consistent with an intention that the Council should not be subject to the President's supervision and control, and in particular its members to his removal power.

In summary, we find nothing in any of the structural aspects of the Council that establish an intent on the part of Congress to insulate the Council's membership from the President's removal power.[9] Indeed, the most recent amendments to the Act suggest an intent to strengthen, rather than attenuate, the Council's relationship with the President, to the point that Congress has actually relinquished some of the control it asserted in 1976.

An examination of the Council's functions leads us to the same basic conclusion. The Council's advisory and reviewing roles under §§ 106 and 202 of the Act are primarily executive in nature, and, on a constitutional spectrum, locate the Council squarely within "the Executive Branch." While its "watchdog" functions suggest the desirability of the Council's maintaining a certain independence from other Executive Branch agencies, this need for independence does not extend to the President himself. Indeed, it is likely that the Council would find it useful in fulfilling its statutory tasks to be able to call upon the President for support and assistance in its dealing with other federal agencies whose heads are subject to his removal power. A power to make rules and grant exemptions from them does not distinguish the Council from a number of other

---

[8] The deleted sentence provided:

> Whenever the Council transmits any legislative recommendations, or testimony, or comments on legislation to the President or the Office of Management and Budget, it shall concurrently transmit copies thereof to the House Committee on Interior and Insular Affairs and the Senate Committee on Interior and Insular Affairs

The 1980 House Report comments on the requirement as having

> proven to hinder the Council in its provision of independent advice to both the President and the Congress.

See 1980 House Report at 42. We would in any event question the constitutionality of a legislative requirement that the Council's reports and recommendations be transmitted to Congress without affording it the opportunity to communicate them first to the President See note 7, supra, and Feb. 21, 1977, Memorandum Opinion for the Attorney General on "Inspector General Legislation," 1 Op. O.L.C. 16, 17 (1977) Cf Buckley v Valeo, 424 U.S. 1, 137–38 (1976)

[9] Congress may, of course, utilize its own committees for the gathering of information or appoint advisory committees to assist in its own legislative functions. Where Congress places the power of appointment in the President, however, it must be assumed to have been aware that as a practical matter presidential appointees will be dependent upon the President and not on Congress, and that as a constitutional matter the power to remove will follow from and be dictated by the structure chosen.

186

similarly charged Executive Branch agencies whose heads are clearly subject to the President's removal power. *See, e.g.,* 42 U.S.C. § 7418 (federal facilities must comply with EPA emissions rules under Clean Air Act); 42 U.S.C. § 2000e–16 (federal employers are subject to rules and regulations of Equal Employment Opportunity Commission).

Authority in the Council to bring lawsuits against other Executive Branch agencies to enforce the provisions of the Act is somewhat more difficult to reconcile with a congressional intent that its members be subject to the President's removal power. We therefore must examine closely the provisions in § 205(b) of the Act purporting to give the Council authority to seek judicial "enforcement of [its] agreements with Federal agencies."

As noted in the preceding section, § 205(b) of the Act authorizes the Council's legal staff to "represent the Council in courts of law whenever appropriate, including enforcement of agreements with Federal agencies to which the Council is a party," and to "assist the Department of Justice in handling litigation concerning the council. . . ." 16 U.S.C. § 470m(b). Our understanding of this ambiguous mandate is not enhanced by reference to the legislative history of the provision. As originally enacted in 1976, this provision appears to have been intended to deal with the "jurisdictional conflicts" generated by the Council's close administrative association with the Department of the Interior, and in particular the provision of day-to-day legal services to the Council by the Solicitor of the Interior. *See* 1975 Senate Report at 12, 32; 1975 Senate Hearings at 303–04. It did not include the phrase referring to the enforcement of agreements with other federal agencies. While the legislative history does not explain what Congress considered "appropriate" representation of the Council in court by its own attorneys, it is possible that Congress had in mind some situation in which the Department of Justice was unwilling or unable for some reason to represent the United States in connection with a violation of the Act. Whatever litigating authority was intended for the Council in 1976, the addition in 1980 of the phrase referring to the enforcement of the Council's agreements with other agencies suggests that Congress may by that time have been thinking of a situation in which the Department of Justice might be obligated to represent some other federal agency whose position as a party to one of the "agreements" described in the Council's regulations conflicted with that asserted by the Council itself.[10]

---

[10] Thus the 1980 House Report states:

> Section 301(1) clarifies the existing authority of the Council to institute legal proceedings on its own behalf to ensure compliance with the Act. Specifically added is language that refers to the enforcement of agreements with Federal agencies under Section 106, other authorities contained in this Act and implementing regulations. In most instances it is expected that the Council will utilize the services of the Department of Justice with regard to litigation However, it is recognized that *situations may arise where a Federal agency may violate the provisions of this Act and the only recourse is initiation of legal proceedings by the Council in its own name.*

1980 House Report at 42 (emphasis supplied). We know of no situation in which the Council has asserted for itself a litigating authority independent of the Justice Department, much less an authority to take an opposing position in litigation.

187

A legislative scheme in which disputes between Executive Branch agencies are to be settled in some forum other than one responsible to the President—in this case federal or state court—would raise a number of serious problems under both Article II and, potentially, Article III of the Constitution.[11] Indeed we doubt that Congress could constitutionally authorize one Executive Branch agency to sue another in a context such as this one. We will, therefore, not assume that Congress intended such a scheme absent the most compelling and unambiguous statutory language.[12]

## III. Constitutional Analysis

An examination of the relevant principles of constitutional law reinforces our conclusion that Congress intended Council members to be freely removable by the President.

Although the Constitution does not explicitly provide for the removal of officers of the United States, it has long been the general rule that "[i]n the absence of specific provision to the contrary, the power of removal is incident to the power of appointment." *In re Hennen*, 38 U.S. (13 Pet.) 230, 259 (1839). *See also Myers* v. *United States* at 119. The specification of a term of office does not indicate a congressional intent to preclude mid-term removal, but is merely a limitation of the period that the officer may serve without reappointment. *See Parsons* v. *United States*, 167 U.S. 324 (1897). Where the President's appointment power is involved, the presumption against limiting the removal power is rooted in the "take care" clause of the Constitution, and any limitations on it

---

[11] Article II of the Constitution vests the executive power of the United States in the President, a power which includes general administrative control over those executing the laws *See Myers* v. *United States*, 272 U S 52, 163–64 (1926) This power of control extends to the entire Executive Branch, and includes the coordination and supervision of all litigation undertaken in the name of the United States. It was the intention of the Framers, as recognized by the Supreme Court in the *Myers* case, that the executive power would be exercised in a "unitary and uniform" way. 272 U.S. at 135. The President thus has a special obligation to review decisions or actions that have given rise to conflict within the Executive Branch, and Congress has no power to prevent his exercising his supervisory authority for the purpose of resolving inter-agency disputes *See* discussion in Feb 21, 1977, Memorandum Opinion for the Attorney General on "Inspector General Legislation," 1 Op. O L C 16 (1977) Similarly, Congress may not, consistent with Article III of the Constitution, direct federal courts to adjudicate controversies which do not meet constitutional standards of justiciability *See Muskrat* v *United States*, 219 U.S. 346 (1911). If both the Council and the agency alleged to have violated the Act are within the Executive Branch, then the President has both the power and the duty to resolve any dispute between them as to whether a violation of the Act has occurred To provide instead that the judiciary should resolve the dispute would go against the established principle of federal jurisdiction that a person cannot create a justiciable controversy against himself, and itself raise a separation of powers issue. The courts might well question whether, in light of the President's overall authority over both agencies, sufficient adversariness exists in such a situation. *Cf. South Spring Hill Gold Mining Co.* v *Amador Medean Gold Mining Co.*, 145 U.S. 300 (1892). They might also conclude that legal disputes between Executive Branch agencies are more properly for the President to resolve as part of his constitutional duty to "take Care that the Laws be faithfully executed." Art II, § 3. *See* Memorandum Opinion for the Acting Assistant Attorney General, Tax Division, April 22, 1977, 1 Op. O L C. 79, 83 (1977) (dispute between Internal Revenue Service and Postal Service not justiciable). *Compare United States* v *Nixon*, 418 U S. 683 (1974) and *United States* v. *ICC*, 337 U.S. 426 (1949). In this case it is unlikely that the Council's enforcement of one of its agreements with another federal agency would be regarded as an action taken on behalf of a private party or parties, so as to satisfy the requirements of justiciability suggested by the holding of *United States* v. *ICC*.

[12] We express no views as to whether the Council's legal staff may be authorized by the Act to bring suit against independent regulatory commissions such as the Federal Trade Commission whose members do not serve at the pleasure of the President, or to represent the position of the United States in court in connection with a violation of the Act where the Justice Department is unwilling or for some reason unable to do so. Neither of these authorities would in any event be inconsistent with Council members' being subject to the President's removal power

must be strictly and narrowly construed. *See Myers* v. *United States* at 161, 164. Therefore Congress may constitutionally restrict the President's removal power only if the officer serves on an "independent" body whose tasks are primarily quasi-legislative or quasi-judicial, and which tasks "require absolute freedom from Executive interference." *Wiener* v. *United States*, 357 U.S. 349, 353 (1958). *See Humphrey's Executor* v. *United States*, 295 U.S. 602 (1935). If an agency's primary functions are "purely executive," the President's power to remove its members must under the Constitution be unfettered. *Id.* at 631–32.[13]

As discussed in the preceding section, the Council is structured in such a way as to make it administratively "independent" within the Executive Branch. In particular, we have noted the statutory provisions which purport to prohibit its being required to channel its reports to Congress through the Executive Office of the President. None of its structural features is, however, necessarily incompatible or inconsistent with its also being ultimately subject to the authority and supervision of the President himself. More importantly, as the Court noted in *Wiener*, "the most reliable factor for drawing an inference regarding the President's power of removal . . . is the nature of the function that Congress vested in the [Council]." 357 U.S. at 353. An examination of the Council's functions leaves no doubt that they are primarily executive in nature. The Council's advisory and reviewing roles under §§ 106 and 202 of the Act suggest the desirability of its maintaining a certain independence of other Executive Branch agencies, but these are "purely executive" functions which do not require "absolute freedom from Executive interference" under the standards set forth in *Humphrey's Executor* and *Wiener*.[14] While the rulemaking and exemption-granting authorities arguably conferred on the Council by §§ 211 and 214 of the Act are closer to the quasi-legislative or quasi-adjudicative functions which may constitutionally be insulated from the threat of removal, these are not its primary tasks. Finally, even if one assumes some limited authority in the Council to litigate in the name of the United States, this is the prototype of a "purely executive" function.[15]

In sum, the primary functions of the Council, as interpreted in light of the relevant constitutional principles, are not such as to permit its members' insula-

---

[13] In *Humphrey's Executor* the Court ruled that members of the Federal Trade Commission needed security against mid-term removal in order to "exercise [their] judgment without the leave or hindrance of any other official or any department of the government " 295 U S. at 625–26 Specifically, its quasi-legislative and quasi-judicial functions required that it be free of executive control. *See* 295 U.S at 628. Similarly, in *Wiener*, the adjudicative functions of the War Claims Commission were held to require freedom from "control or coercive influence" by the Executive. 357 U S at 355, quoting from 295 U.S at 629.

[14] In the context of examining the nature of the functions of another advisory body created to advise an Executive Branch Department, the District Court for the District of Massachusetts recently recognized that giving advice and making recommendations "fall into the category of 'purely executive '" *Martin* v *Reagan*, 525 F Supp 110, 113 (D. Mass. 1981) (National Institute of Justice Advisory Board) *See also Patino* v *Reagan*, Civil No. S–81–469 MLS (E.D Cal Sept 29, 1981). Those cases involved removal by the President of his appointees to advisory boards which advised the National Institute of Justice (NIJ) The NIJ, as the Council here, has been expressly endowed by Congress with a measure of independence from the Attorney General in its day-to-day decisionmaking: its director, however, serves at the pleasure of the President

[15] We doubt that Congress could constitutionally authorize the Council's legal staff to sue other Executive Branch agencies if those agencies were, like the Council, subject to direction and supervision by the President. *See* note 11, *supra*

189

tion from the President's authority and control. We will not, therefore, infer from Congress' silence on the matter that it intended to impose any restrictions on his power to remove his appointees to the Council whenever he wishes to do so, and for whatever reason he chooses.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*