UNITED STATES of America, Plaintiff,

v.

OHIO EDISON COMPANY, Defendant.

No. C87–1122A.

United States District Court,
N.D. Ohio, E.D.

Oct. 24, 1989.

---

Kathleen Ann Sutula, Asst. U.S. Atty., Gregory Fess, Sp. Asst. U.S. Atty., Cleveland, Ohio, Robert H. Oakley, Sr. Lawyer, Environmental Enforcement Section Land and Natural Resources Div., Dept. of Justice, Washington, D.C., for plaintiff.

Robert L. Brubaker and Brenda J. Lynch, Porter, Wright, Morris & Arthur, Columbus and Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge.

I. *Introduction.*

This is an action for injunctive relief and civil penalties pursuant to Sections 309(b) and (d) of the Federal Water Pollution Control Act ("the Act"). Plaintiff alleges that defendant violated a condition of its National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. sec. 1319(b). Plaintiff brings this action at the request of the Administrator of the United States Environmental Protection Agency ("EPA"). Defendant operates an electric utility power plant in Niles, Ohio which discharges heated water to the Mahoning River.

Plaintiff alleges that the terms of the permit required defendant to construct a cooling tower to limit discharge of heated water, and that construction was to begin on the tower by September 6, 1985. Defendant has not constructed the tower.

This action is before the Court on defendant's motion to dismiss which, on April 28, 1989, the Court converted into a motion for

summary judgment. Fed.R.Civ.P. 12(b). The parties have filed supplemental briefs with supporting affidavits and factual material. For the reasons which follow, the motion is granted as to plaintiff's claim for injunctive relief and denied as to plaintiff's claim for civil penalties.

## II. *Background.*

The relevant facts relating to this action are not in dispute. On February 21, 1978 defendant was issued a NPDES permit by the EPA which required construction on the tower to begin by October 1, 1982. The permit was modified on March 3, 1982 to extend the obligation to commence construction—

> beyond October 1, 1982, if the City of Youngstown fails to commence construction of secondary or advanced treatment facilities on or before October 1, 1982. If the City of Youngstown fails to commence construction of secondary or advanced treatment facilities on or before October 1, 1982, Ohio Edison shall not be obligated to commence construction of closed cycle cooling at the Niles Plant until thirty (30) days after the City of Youngstown commences construction of secondary or advanced treatment facilities.

Also on March 3, 1982, Ohio Edison entered into a stipulation with Ohio EPA in which it "waive[d] any further requests for extension or modification of its obligation to install closed cycle cooling at the Niles Generating Plant."

The permit expired on February 20, 1983, but remained in full force and effect by operation of the law of the State of Ohio. Sections 119.06 and 6111.04, Ohio Revised Code.

On August 7, 1985, the City of Youngstown began a continuous program of construction of secondary treatment facilities. Ohio Edison did not commence construction within thirty days.

On May 1, 1987, Ohio Edison obtained a revised NPDES permit from Ohio EPA that deleted the requirement to construct a cooling tower, and instead allowed defendant to limit its thermal discharge by means of load management. The load management program requires Ohio Edison to cut back on the production of electric power during summer months if the temperature in the Mahoning River exceeds 89 degrees farenheit at the temperature monitoring station.

Ohio Edison contends that it did not commence construction of the cooling tower by the September 6, 1985 deadline due to concerns about the "potential adverse health effect of toxic drift," which defendant defines as the "thermodynamic dispersal of concentrated toxic contaminants and pathogens from the river water into the ambient air by operation of the cooling tower." In 1982, Ohio Edison commissioned a study to assess the possibility of toxic drift. The completed report was submitted to Ohio EPA and the Ohio Department of Health in early 1984.

The Director of the Ohio EPA wrote a letter on January 11, 1985, in which he stated that Ohio EPA "remains agreeable to an extension of the construction schedule for the cooling tower until these issues [funding and implementation of a risk assessment study to be performed by Ohio EPA and Ohio Department of Health] are resolved."

On February 14, 1986, the Director of the Ohio EPA sent a letter to Ohio Edison to inform the Company that, based on Ohio EPA's evaluation of the health effects and all information available, the potential health risks associated with the construction of the cooling tower were minimal. The Director went on to state that "Ohio Edison should proceed with the construction of the cooling tower at the Niles Plant ... The renewal of the expired NPDES permit for the Niles Plant will contain the compliance schedule for the construction of the cooling tower ... The Ohio EPA would like to meet with you ... to discuss the renewal permit." This meeting was conducted on March 26, 1986. New data collected by Ohio EPA, which demonstrated declining temperature levels in the Mahoning River, led the Director to request that Ohio Edison begin evaluating the implementation of a load management pro-

gram alternative to the cooling tower requirement. In July, 1986, Ohio Edison submitted a final revised report. Ohio EPA concluded that the proposed load management program satisfied the criteria for establishing an alternative thermal effluent limitation pursuant to Section 316(a) of the Clean Water Act, 33 U.S.C. Section 1326(a), and on August 22, 1986 informed U.S. EPA of its intent to issue a renewal NPDES permit containing the load management program. On September 29, 1986, Ohio EPA issued the proposed renewal permit for public comment.

This action was filed on May 6, 1987, five days after the issuance of the revised NPDES permit. Defendant Ohio Edison contends that there is no legal basis for this suit since plaintiff seeks to enforce compliance with a condition of a permit that was superseded on May 1, 1987. Defendant also contends that the cooling tower construction schedule was "suspended" by Ohio EPA on January 11, 1985, and that since the United States EPA did not object at that time to the "suspension", plaintiff cannot now "override the State's judgment that enforcement of the prior cooling tower requirement was not in the public interest [or] ... penalize Ohio Edison for its concern about the citizens of Niles and surrounding communities."

While plaintiff suggests that the motivation for defendant's efforts to change the terms of the NPDES permit was "to save money", the primary thrust of the argument in response to defendant's summary judgment motion relates to the authority of the Ohio EPA to modify the cooling tower construction schedule. Plaintiff argues that the "suspension" of the cooling tower compliance schedule relied upon by defendant is void since Ohio EPA "lacked any authority to suspend or otherwise unilaterally modify the requirements of the NPDES permit at issue." Plaintiff contends that modification of the permit could only be achieved by following the procedures set forth in 40 CFR 122.62 and 124.5. Plaintiff seeks injunctive relief (which it concedes may now be moot in light of the new permit), and penalties.

III. *Discussion.*

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Sixth Circuit Court of Appeals has held that summary judgment is to be used with "extreme caution", as it is a drastic remedy. *Smith v. Hudson,* 600 F.2d 60, 63 (6th Cir.1979), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). It is the moving party's burden to demonstrate that there is no genuine issue of material fact and "the evidence together with all inferences to be drawn therefrom must be read in the light most favorable to the party opposing the motion." *Smith v. Hudson, supra* at 63, *citing Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *See Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

A. U.S. EPA's authority to maintain an action for civil penalties for violation of a term in a superseded permit.

■ Defendant argues that plaintiff is barred from seeking civil penalties pursuant to Section 309(d) of the Act, 33 U.S.C. section 1319(d). Defendant, relying on *Public Interest Research Group of New Jersey, Inc. v. Carter–Wallace, Inc.,* 684 F.Supp. 115 (D.N.J.1988), contends that plaintiff cannot enforce the superseded permit. *Carter–Wallace,* however, was an action brought by a citizens' group, and in *Carter–Wallace,* the court expressly distinguished the facts of that case from one in which the plaintiff was the United States. In *Carter–Wallace,* the court noted that in *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), the Supreme Court "drew a careful distinction between the Administrator's ability to seek penalties, governed by section 1319(d) [of the Clean Water Act], and the ability of a citizen group to seek penalties, governed by the conjunction of sections 165(a) and 1319(d)." 684 F.Supp. at 118. Indeed, in *Gwaltney* the Court stated that "it is little questioned that the Administrator may

bring enforcement actions to recover civil penalties for wholly past violations ..." 108 S.Ct. at 381–82. Accordingly, plaintiff may bring suit for purely past violations. In light of *Gwaltney*, defendant's argument that it must have been *presently* in violation of the Act when the suit was filed in order for this Court to maintain jurisdiction is not persuasive.

B. Procedure for obtaining a Section 316(a) Variance.

The central issue raised by this case is whether Section 316(a) of the Act, 33 U.S.C. section 1326(a), permits a state environmental protection agency to suspend a cooling tower requirement of a NPDES permit without first providing for public notice and hearing. Section 316(a) specifically regulates thermal discharges and provides in pertinent part:

> With respect to any point source otherwise subject to the provisions of section 1311 of this title or section 1316 of this title, whenever the owner or operator of any such source, *after opportunity for public hearing*, can demonstrate to the satisfaction of the Administrator (or, if appropriate, the State) that any effluent limitation proposed for the control of the thermal component of any discharge from such source will require effluent limitations more stringent than necessary to assure the projection [sic] and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in and on the body of water into which the discharge is to be made, the Administrator (or, if appropriate, the State) may impose an effluent limitation under such sections for such plant ... that will assure the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in and on that body of water. [Emphasis added].

The statute expressly requires the state to provide an opportunity for public hearing prior to issuance of a Section 316(a) variance. *See Seacoast Anti–Pollution League v. Costle*, 572 F.2d 872, 875 at n. 3 (1st Cir.1978).

The requirements for modification of an NPDES permit are developed at 40 CFR 122.62 and 124.5. When a permittee files a request for a Section 316(a) variance such action comes within the definition of a "modification" within the regulations' definition of that term for which public notice and opportunity for hearing are required. 40 CFR 122.62(a)(5). Furthermore, proposed modifications must be submitted to U.S. EPA for approval.

Defendant, relying on 40 CFR 124.-62(a)(3), contends that a thermal variance can be obtained without the approval of the U.S. EPA Regional Administrator. This section provides that the State agency Director may grant or deny requests for a section 316(a) variance (subject to EPA objection under sec. 123.44). 40 CFR 123.44 requires the state agency to file a proposed permit along with the other relevant information to EPA for review. 40 CFR 124.-62(a)(3) does not allow the Director to circumvent the statutory requirement for public notice and opportunity for hearing prior to the issuance of a Section 316(a) variance.

Defendant also maintains that it obtained an "early decision" on its variance request prior to a draft NPDES permit being issued. 40 CFR 124.66 provides that once a permit applicant requests an early decision, the Administrator (in this case, the Director of the Ohio EPA) may grant an early decision on the application. If an early decision is obtained, the decision is considered permit issuance "and shall be subject to the same requirements of public notice and comment and the same opportunity for an evidentiary hearing or panel hearing under Subpart E or F." When the language of the regulation is read in conjunction with the statute, the section can only mean that the Administrator's final decision, although expedited, still requires public notice and opportunity for hearing before it is effective, especially in light of paragraph (c) of the section which provides that "[a]ny proceeding held under paragraph (a) of this section shall be publicly noticed ..."

Public notice of the superseding permit was not provided until September 29, 1986. Therefore, defendant may be liable for civil penalties for the period from September 6, 1985 (the date defendant was required to commence construction of the tower) to at least September 29, 1986.

■ Standing alone, neither the Ohio EPA letter of January 11, 1985 nor the letter of February 14, 1986 effectively modified defendant's NPDES permit. Andrew Turner, who was the Chief of the Division of Water Pollution Control for Ohio EPA at the time, states in his affidavit that "U.S. EPA was advised of the suspension of the cooling tower construction schedule by Ohio EPA [during the evaluation of possible health risks following the January 11, 1985 letter]." Informal and unilateral action such as the two letters is insufficient to modify an NPDES permit. *See United States v. City of Bedford*, No. C85–2897, slip op. (N.D.Ohio 1987) and *United States v. Ford Motor Co.*, 814 F.2d 1099 (6th Cir.1987), *cert. denied*, 484 U.S. 822, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987).

Defendant contends, however, that the U.S. EPA "waived any objection" to the suspension since it did not object or oppose the action. Sending a copy of the letter to the U.S. EPA, however, is not equivalent to the procedural requirements set forth in 40 CFR 123.44 or Section 402(d) of the Act, which allow the Administrator of the U.S. EPA to veto a state's issuance of a permit. Section 402(d) indicates that notification by the state shall consist of the state's transmitting to the Administrator a copy of a proposed permit, along with notification of every action relating to the consideration of such application. The file does not reflect any waiver of objection by the U.S. EPA.

■ The United States Environmental Protection Agency is the "dominant agency" for achieving the purposes and goals of the Clean Water Act, even if a state permit program has been approved. *Cleveland Electric Illuminating Co. v. Environmental Protection Agency*, 603 F.2d 1, 5 (6th Cir.1979). Although a State with an approved NPDES permit program has primary responsibility for issuance of NPDES permits, the Act provides U.S. EPA with authority for overseeing a State's administration of the program and for taking enforcement action in appropriate situations, notwithstanding an approved state permit program with concomitant enforcement powers.

C. The civil penalties provision.

In *Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), the Supreme Court described the legislative purpose of Section 309(d), the civil penalty provision of the Act:

> The legislative history of the Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties. 123 Cong. Rec. 39191 (1977) (Sen. Muskie citing EPA memorandum outlining enforcement policy). A court can require retribution for wrongful conduct based on the seriousness of the violations, the number of prior violations, and the lack of good faith efforts to comply with the relevant requirements. *Ibid.*

481 U.S. at 422–23, 107 S.Ct. at 1838.

> Section 309(d) provides, in pertinent part:
>
> Any person who violates ... any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator, or by a State ... shall be subject to a civil penalty not to exceed $25,000 per day for each violation. In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require ...

33 U.S.C. Section 1319(d).

Given the history of what might have been good-faith adherence to Ohio EPA's directives and guidance as well as possible lack of effective communication between

the Ohio EPA and U.S. EPA, I believe that on the record currently before the Court, a substantial penalty may not be warranted. Defendant contends that "[a]lthough construction of the cooling tower would have commenced prior to the issuance of the 1987 renewal permit, if the requirement had not been suspended ... construction would not have been completed, or required to be completed, prior to the issuance of the 1987 permit ... Ohio Edison has only failed to commence, and abandon midway without completion, construction of a needless facility." Defendant claims that it has not "discharged heat or any other pollutants to the Mahoning River in excess of the limits prescribed in either its expired or current NPDES permit." Therefore, defendant argues that it would be unfair to punish defendant by imposing penalties in this case.

■ Even assuming that defendant is without fault in this matter, the statute does not require fault to support a penalty. Issues of fault and intent are relevant only on the question of the amount of penalty imposed. *See United States v. Amoco Oil Co.,* 580 F.Supp. 1042 (D.Mo.1984), *Student Public Interest Research Group of New Jersey, Inc. v. Tenneco Polymers, Inc.,* 602 F.Supp. 1394 (D.N.J.1985), and *National Wildlife Federation v. Consumers Power Co.,* 657 F.Supp. 989, 1012 (W.D.Mich. 1987). Once it has been determined that the terms of a permit have been violated, Section 309(d) provides substantial discretion to the Court in determining the amount of penalties.

D. Conclusion.

Defendant's motion for summary judgment as to the assessment of a civil penalty is denied. Defendant's motion for summary judgment as to injunctive relief is granted in light of the issuance of the superseding 1987 NPDES permit. This case shall come on for evidentiary hearing on January 16, 1990. Within 60 (sixty) days of this Order, the parties shall submit memoranda to the Court to assist the Court in determining an appropriate penalty, if it is determined following the evidentiary hearing that a penalty is appropriate. The parties should address those Section 309(d) factors not already discussed in the pleadings presently before the Court.

IT IS SO ORDERED.