**GREENFIELD MILLS, INC.,**
et al. Plaintiffs,

v.

**Governor O'BANNON,**
et al. Defendant.

**No. 1:00 CV 0219.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

March 11, 2002.

Neal Lewis, Neal Lewis and Associates, Orland, FL, Eric Lewis, McCroskey Feldman Cochrane and Brock, Muskegon, MI, for Greenfield Mills Inc, Judi Medlock, Eleanor Elliott, Marian Donley, Howard Rinkel, Helen Rinkel, Dan Rinkel, Marilyn Rinkel, Howard Elliott, Jeff Dunfee, Ben Johnson, Debra Johnson, plaintiffs.

Jeffrey A James, LaGrange, Eric Lewis, McCroskey Feldman Cochrane and Brock, Muskegon, MI, for Gene Lewis, Sharon Lewis, plaintiffs.

Anita Wylie, Indiana Attorney General, Sierra Lynn Cutts, Indiana Attorney General, Indianapolis, IN, for Larry Macklin, as Director of the in Dept of Natural Resources, Gary Armstrong, as individual, Neil Ledet, as individual, David Clary, as individual, Tom Meyer, as individual, defendants.

### MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

This lawsuit, initiated by twelve citizen plaintiffs and Greenfield Mills, Inc., alleges that the Defendants, Larry Macklin in his capacity as the Director of the Indiana Department of Natural Resources ("IDNR") and individual defendants Gary Armstrong, Neil Ledet, David Clary and Tom Meyer, violated the Clean Water Act, 33 U.S.C. § 1311 and § 1344, as well as various constitutional rights of the Plaintiffs when they opened one of three flow control gates at the Fawn River State Fish Hatchery thereby causing accumulated sediment to be deposited in the Fawn River.

Presently before the court are: Defendants' motion for summary judgment (Docket # 74); Plaintiffs' motion for partial summary judgment (Docket # 81); Defendants' Motion to Reserve Right to Disqualify Neil Lewis (Docket # 113); Defendants' Motion to Strike Affidavits of W. Lewis, S. Lewis and 2nd Affidavit of G. Lewis (Docket # 115); Defendants' Motion to Strike Refiled Notice of Objections to Statement of Genuine Issues (Docket # 118); Defendants' Supplemental Motion for Summary Judgment (Docket # 123) and Plaintiffs' Motion to Voluntarily Dismiss Certain § 1983 Claims (Docket # 127).

For the following reasons, Plaintiffs' Motion to Voluntarily Dismiss Certain

§ 1983 Claims (Docket # 127) will be granted. Defendants' motion for summary judgment (Docket # 74) will be granted as to Plaintiffs' claims for violations of the Clean Water Act, and granted as to Plaintiff's § 1983 due process claim. Defendants' Supplemental Motion for Summary Judgment (Docket # 123) will be granted as to Plaintiffs' § 1983 takings claim. Plaintiffs' motion for partial summary judgment (Docket # 81) will be denied. Defendants' Motion to Reserve Right to Disqualify Neil Lewis (Docket # 113) will be denied as moot. Defendants' Motion to Strike Affidavits of W. Lewis, S. Lewis and 2nd Affidavit of G. Lewis (Docket # 115) and Defendants' Motion to Strike Refiled Notice of Objections to Statement of Genuine Issues (Docket # 118) will be denied.

## FACTUAL BACKGROUND [1]

This lawsuit is the latest in a series of legal go arounds between the Plaintiffs and the Defendants over the Fawn River and an attempt by the Defendants to cause what the Plaintiffs allege to be environmental damage to the Fawn River and its aquatic life. *See Town Board of Orland v.* *Greenfield Mills, Inc.,* 663 N.E.2d 523 (Ind.1996).[2]

## A. General Background

The IDNR owns and operates the Fawn River State Fish Hatchery ("the Hatchery") located on the Fawn River in Orland, Indiana. The Hatchery raises smallmouth bass, walleye, muskies, channel catfish, and rainbow trout for stocking Indiana's lakes and rivers. It consists of fourteen rearing ponds, two administrative service buildings, and a residence for the assistant property manager.

Defendant Dave Clary ("Clary") is currently and has been the property manager for the Hatchery since January 1996. Defendant Tom Meyer ("Meyer") is the Assistant Property Manager of the Hatchery and lives in the Hatchery's onsite residence. Defendant Neil Ledet ("Ledet") is, and has been, IDNR's District 2 Fisheries Biologist since January 1982.

The Plaintiffs are landowners of properties abutting the Fawn River. The Fawn River runs through the Hatchery property from east to west and passes behind the main administration building. It is

---

1. These facts are the undisputed material facts adapted from the parties' statement of material facts submitted with their motions for summary judgment.

2. In 1995, all of the present Plaintiffs (except for Howard Elliott and Jeff Dunfee) filed suit to enjoin the Town of Orland from constructing and operating a sewage treatment plant claiming that the discharge from the project would " 'cause significant environmental damage to the Fawn River and significant damage to the aquatic species of animals and plants' in and along the river; and (ii) violate their constitutionally protected property rights in that it would constitute an 'impermissible trespass' upon the landowners' riparian property and would 'seriously injure' the landowners' riparian property rights; 'seriously interfere' with the landowners' right to use and enjoy their riparian property; and

violate the landowners' riparian property rights." *Town of Orland,* 663 N.E.2d at 525. The plaintiffs eventually succeeded in their initial request for a preliminary injunction. However, the plaintiffs ultimately lost on appeal for failure to exhaust their administrative remedies. The plaintiffs also filed administrative suits against the IDNR to prevent issuance of associated permits for the sewer. These administrative proceedings were halted after the Town of Orland ended its plan for a sewer discharging to the Fawn River. However, the plaintiffs continued to criticize the IDNR and its local officials publicly for its involvement in the proposed sewer project.

The Court has also been advised of a parallel lawsuit filed in state court asserting the same claims that are presented in this federal lawsuit. However, the state court proceedings involve different defendants.

dammed west of the main building forming a 1.8 acre supply pond which feeds (by gravity) the six rearing ponds on the west side of State Route 327. The water level of the supply pond is regulated by two different structures, the main flow control structure located at the southern end of the dam, and an emergency spillway located at the northern end of the dam. A bypass channel upstream of the supply pond is used to divert water before it reaches the supply pond.

The supply pond's flow control structure consists of six separate gates—three upper and three lower—which sit on a concrete apron. These gates are manipulated individually, and a top gate must be raised in order to raise the gate directly below. The gates are made of horizontal oak boards fitted together. The gates are slotted into vertical I-beams.

### B. Problems with the Flow Control Structure [3]

In the latter half of 1996, Meyer noticed that the I-beams showed areas where the webbing had rusted thereby affecting the structural integrity of the water flow control structure. Meyer related this discovery to Clary who, in turn, notified Defendant Gary Armstrong ("Armstrong"), Hatcheries Supervisor. Thereafter, on March 31, 1997, Clary contacted a local welder, Jeff Counterman ("Counterman") to inspect the water control structure. Counterman inspected the flow control structure and observed "serious deterioration of the two metal 'channel' sections." (Counterman Dec. ¶ 4). Thereafter, Counterman discussed with Clary and Meyer the repair project, strategies for repair, and the cost of repair. Clary and Meyer needed to seek funding for this project and

thus the two developed a project proposal and budget and sent it to Armstrong on April 16, 1997 for his review. The project proposal included drawing down the supply pond, cutting out the rusted sections of the I-beams, and replacing them with new beams. On October 23, 1997, Armstrong submitted the project proposal for funding approval and, it appears, the project was approved to begin at some undetermined time in the future.

### C. Problems with the River Intake Plumbing

On March 12, 1998, Clary noticed an additional problem at the Hatchery. This problem involved the river intake plumbing located in the supply pond. The river intake plumbing is used to run water into the Hatchery and rearing ponds and is critical to Hatchery operations. The river pump did not hold its prime, rendering this hatchery water supply source nonfunctional. Clary and Meyer determined that a faulty foot-valve located within the river intake structure was allowing water to drain back out of the system each time the pump shut off. A new foot valve and cover screen were purchased and installed in mid-April 1998. However, when the river pump was next used on May 15, 1998, the priming problem still existed. Clary and Meyer then determined (by a process of elimination) that the problem with the river pump holding its prime had to be with the piping in the river inlet structure and that the underwater plumbing and associated fittings needed replacing. To examine the piping, Clary and Meyer concluded that the plumbing in the river inlet structure needed to be exposed. Thus, the two decided to draw-down the supply pond to make repairs to the river inlet fill line

---

**3.** The Plaintiffs have not set forth any competent factual basis disputing the facts contained in this subsection C or in the following subsection D as it relates to the state of the

dam at the time it was raised. Thus, the court shall accept the Defendants' version of these facts as true.

plumbing, inspect and diagnose problems with the river inlet box screening system, and to serve as a test draw-down for the proposed flow control structure repair. Because use of the pump system was required for Walleye pond harvesting in June 1998, Clary and Meyer decided to proceed with the draw-down prior to June 1998.

### D. *Events of May 18, 1998*

On May 18, 1998, Meyer and Clary began the draw-down process. They began by raising the top three flow gates and securing them in an "up" position. A lower gate was raised incrementally as Meyer and Clary checked the water level in the river intake structure to see if the fill line plumbing was exposed. This process continued until the hatchery supply pond was drawn down to a channel and the plumbing in the river intake structure was exposed. The lower gate was then secured in an upright position by 11:00 a.m.[4]

During the process of raising the lower gate, Meyer observed discolored water passing under the bottom gate panel. Meyer also observed that the water exiting the supply pond and the river immediately downstream appeared discolored.

Shortly after securing the lower gate, Meyer and Clary then began observing the effect of the draw-down downstream, in particular, the two focused on the rock dam just upstream of the Assistant Property Manager's residence.[5] The two walked downstream of the rock dam and observed a two to three foot waterfall at the rock dam. They then proceeded to the rearing ponds east of SR 327 and observed a slight reduction of the water level there. Both Clary and Meyer observed that the clarity of all waters upstream of the rock dam was unremarkable.[6]

During the morning's events, Ledet had been making rounds for permit inspections and was unaware of Clary and Meyer's decision to draw-down the supply pond. Ledet arrived at the Hatchery in the early afternoon and noticed that the supply pond had been lowered. He then joined up with Meyer at the flow control structures where the two discussed the draw-down and the proposed repair to the flow control structure. At this point, Plaintiff Gene Lewis arrived and confronted Meyer and Ledet, appearing to them to be visibly upset. Both Meyer and Clary testified that Gene Lewis was expressing his displeasure with the draw-down of the supply pond because silt was being picked up and washed downstream. According to Meyer and Clary, Gene Lewis angrily told them "I told everybody you would draw the millpond down, and now you're doing it." Ledet and Meyer did not understand Gene Lewis' statement and the three spoke for several more minutes before Ledet and Meyer ended the conversation abruptly.

At the same time the above verbal confrontation ensued, Plaintiffs' counsel, Neal Lewis, approached Clary at the site of the gates and demanded that the flow gate be shut. Clary denied this request as the repairs that they intended to make had not been completed. At some point thereafter, both Neal Lewis and Clary arrived at the Hatchery and Neal Lewis repeated his demand to Clary and Meyer that the gate

---

**4.** Originally, Meyer and Clary did not intend to draw-down the supply pond to a channel. However, after beginning the draw-down the two determined that they needed to do so to complete the repairs.

**5.** Clary claims they were concerned because of prior high water issues in Orland.

**6.** Meyer noted in his deposition that the Fawn River's clarity was never perfectly clear and that, to him, the water's clarity after the gate was lowered was therefore, unremarkable.

be lowered immediately. Meyer informed Neal Lewis that they were finishing some repairs and would shut the gate as soon as possible. Clary and Meyer initially continued working on the repairs but decided, after discussing the afternoon's events, to lower the flow gates and stop the repair work. The lower gate was completely closed by 3:00 p.m., the remaining upper gates were closed shortly thereafter, and the supply pond was refilled by approximately 4:00 p.m.

After closing the gates, Meyer observed a thin layer of silt and discolored water immediately downstream of the supply pond. He also noticed that the water in the supply pond was slightly discolored. Meyer did not observe any dead or distressed fish in either the river or supply pond, during or after the draw-down process. Further, at approximately 6:00 p.m., Meyer traveled to the C.R. 1100 bridge to observe the river and noted that water clarity was unremarkable and there existed no dead or distressed fish. Similarly, on his way home from work, Clary observed the river and noted that it appeared normal on both sides of SR 120.

Ledet, too, noticed that the water that was discharging through the dam was "...very dark. It had picked up a lot of—or whatever a lot is—it had picked up you know, bottom muck, sediment material." (Ledet Dep. p. 61). He indicated to Meyer that they should lower the gate as soon as possible after making the necessary repairs.

### E. *Post–Draw–Down Events*

Immediately after the draw-down, the plaintiffs state that the discharge of mud through the dam was visible on their prop-

erties and that vast quantities of mud were damaging the aquatic life in the Fawn River. The May 18, 1998 draw-down of the supply pond created a great deal of publicity in regional and local newspapers detailing the damage alleged to have been done by the IDNR. At some point after both the draw-down and its associated publicity, Plaintiffs state that Meyer approached Neal Lewis and two of his jogging companions at the entrance of the Orland IDNR facility and angrily yelled to them "What's the matter Lewis? Can't you take a joke?" Later, Neal Lewis relayed this comment to some of the other plaintiffs who, in turn, interpreted the comment to be a "taunt" or "joke" by IDNR officials.[7]

Plaintiffs also state that it is widely known throughout the Orland community that Gene and Sharon Lewis host an annual Memorial Day party at their family recreation spot on the bank of the Fawn River. In 1998, the party was scheduled for May 23, 1998 but had to be cancelled due to the sediment and mud that had been discharged into the river on May 18, 1998. Plaintiffs claim that the defendants were aware of this party and purposefully conducted the May 18, 1998 draw-down to interfere with this party.

### F. *State of the Fawn River Post-draw-down*

The parties vastly disagree on the state of the Fawn River after the draw-down. Plaintiffs assert that the amount of sediment discharged by the DNR upon raising the dam was in excess of 100,000 cubic yards (or the equivalent of 10,000 to 33,000 cubic yards contracted) and that this sedi-

---

7. This statement of fact is subject to a motion to strike as are many other averments made in affidavits submitted by the Plaintiffs. The court shall address the motions to strike various averments throughout this Order as they become relevant. To the extent a motion to strike a particular averment is not addressed, the same has been considered moot or irrelevant to the resolution of the pending motions.

ment caused a massive fish kill in the area of the Fawn River downstream from the dam. To support this position, Plaintiffs have offered expert witness affidavits from Michael Zaleha, John Gasper, and Daniel Willard as well as lay person opinions from Marian Donley, Connie Easterday, and Gene Lewis. In sharp contrast, the Defendants allege that the amount of sediment discharged into the Fawn River was *de minimus* and did not cause massive death and destruction to the flora or fauna in the Fawn River. To support their position, the Defendants rely on the first hand accounts of Clary and Meyer who testified that immediately after the draw-down the clarity of the water was "unremarkable."

## DISCUSSION

### I. *Clean Water Act Claims*

Before turning to the substance of the Plaintiffs' claims under the Clean Water Act ("CWA"), some background information is necessary to provide context for the present litigation.

■The Clean Water Act, 33 U.S.C. § 1251 et seq., was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 1251(a). In order to achieve these goals, § 301(a) of the Act makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified permitting sections of the Act. 33 U.S.C. § 1311(a). Indeed, "[t]he permit process is the cornerstone of the ... scheme for cleaning up the nation's waters." *United States v. Huebner*, 752 F.2d

1235, 1239 (7th Cir.1985) (internal quotations omitted).

■ Two of the permitting provisions are implicated in the present case. The first, § 402, establishes the National Pollutant Discharge Elimination System (NPDES). 33 U.S.C. § 1342. Pursuant to § 402(a), the Administrator of the Environmental Protection Agency (EPA) may issue permits authorizing the discharge of pollutants in accordance with specified conditions. 33 U.S.C. § 1342(a).[8] The regulations exempt from the § 402 permitting process "discharges of dredged or fill material into waters of the United States which are regulated under Section 404 of the CWA." 40 C.F.R. § 122.3. Section 404 authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue permits for any activity that will involve the "discharge of dredged or fill material" into the waters of the United States.[9] If a § 404 Permit is required, there is no additional requirement that a § 402 Permit also be obtained. *See Canada Community Improvement Society, Inc., v. City of Michigan City, Indiana*, 742 F.Supp. 1025 (N.D.Ind.1990).

■ The holder of either a § 402 (discharge of pollutants) or a § 404 (discharge of dredged materials) permit is subject to enforcement action by the Administrator for failure to comply with the conditions of the permit. The Administrator's enforcement arsenal includes administrative, civil, and criminal sanctions. In the absence of federal or state enforcement, private citizens may commence civil actions under

---

**8.** Pursuant to § 402(b), each State may establish and administer its own permit program if the program conforms to federal guidelines and is approved by the Administrator. 33 U.S.C. § 1342(b). The Act calls for the Administrator to suspend the issuance of federal permits as to waters subject to an approved state program. 33 U.S.C. § 1342(c)(1).

**9.** Similar to § 402 permits, each State may establish and administer its own permit program if the program conforms to federal guidelines and is approved by the EPA. 33 U.S.C. § 1344(j) and 40 C.F.R. § 233.50.

what has become known as the "Citizen Suit" provision in 33 U.S.C. § 1365. Under that provision, an action may be commenced against any person "who is alleged to be in violation of (A) an effluent standard or limitation under this chapter ..." 33 U.S.C. § 1365(A), (g). "Obtaining a permit is itself an important effluent limitation, and private attorneys general may enforce that limitation via citizen suits." *Hudson River Fishermen's Ass'n v. Westchester County*, 686 F.Supp. 1044, 1050 (S.D.N.Y.1988). If the citizen prevails in such an action, the court may order injunctive relief and/or impose civil penalties payable to the United States Treasury. 33 U.S.C. § 1365(a).

Plaintiffs bring this action pursuant to the Citizen Suit provision of the CWA alleging that the Defendants were required via 33 U.S.C. § 1344(a) (hereinafter "§ 404 Permit") and/or 33 U.S.C. § 1342 (hereinafter "§ 402 Permit") to obtain a permit prior to discharging fill material and pollutants into navigable waters. Defendants respond by conceding that they did not seek either type of permit but contend that their actions with respect to the Fawn River did not require either type of permit. The Defendants have moved for summary judgment on both of Plaintiffs' CWA claims. Plaintiff has cross-moved for summary judgment with respect to the claim under 33 U.S.C. § 1344 only and it is to this claim that the court first turns its attention.[10]

### A. § 404 Permit

■ Section 404 of the CWA authorizes the issuance of permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). The regulations define the term "dredged material" as "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c). The regulations also exclude certain activities from the permitting requirements, the relevant exclusion in this case being an exclusion for the maintenance of dams. 33 U.S.C. § 1344(f)(1)(B). That exclusion provides that no permit is required for "the discharge of dredged or fill material—(B) for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as ...dams ..." except that "[a]ny discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired ...shall be required to have a permit..." 33 U.S.C. § 1344(f)(2). This latter provision in § 1344(f)(2) is termed a "recapture provision" in that even if the activity in question meets the requirements of § 1344(f)(1)(B), the activities may be "recaptured" under the provisions of § 1344(f)(2). *See United States v. Sargent County Water Resource District*, 876 F.Supp. 1090 (D.N.D.1994).

The Plaintiffs raise multiple arguments in support of their motion for partial summary judgment on this claim. First, they assert that the activities of the Defendants fall within the statutory definition of "discharge of dredged material." Second, they argue that the dam maintenance exclusion is not applicable and that a permit was required because (1) "maintenance" under the regulations "does not include

---

10. In their response brief to the Defendants' motion for summary judgment, the Plaintiffs do state "Plaintiffs believe that there may be no material issues of fact on the Clean Water Act 402 Permit count of their complaint, and that the court should issue summary disposition in favor of Plaintiffs on that issue." However, Plaintiffs have not formally filed a motion for summary judgment on this claim.

any modification that changes the character, scope or size of the original fill design;" *Plaintiffs' Brief in Support of Partial Summary Judgment,* p. 12 (citing 33 C.F.R. § 323.4(2)), and (2) the activities meet the "recapture provision" because the discharge affects the flow, circulation, and reach of the Fawn River. In response, the Defendants argue that they did not discharge dredged or fill materials into the Fawn River and, even if they did, they are entitled to use the maintenance exclusion (without recapture) to avoid the permitting requirements. Thus, the Defendants urge the court to deny the Plaintiffs' motion for summary judgment and grant summary judgment in their favor on this claim. The court shall first examine whether the acts done here constitute the "discharge of dredged materials" as defined in the CWA and then turn, if necessary, to whether the maintenance exclusion and recapture apply.

██ Both parties point out that the regulations do not define what conduct constitutes "dredge" or "dredging." Defendants urge the court to apply the common definition of the term and propose the following: "Dredging is to clean or dig up with or as if with a dredge." (Def.'s Brief in Support of Summary Judgment. p. 2 (citing American Heritage Dictionary 2d)). Defendants claim that this definition only contemplates the use of mechanized means to dig up soil or other materials and thus, since the events here occurred through hydraulic dredging, they are not regulated by § 404. To further support their position, the Defendants look to CWA regulations and claim that these regulations clearly identify that only the use of mechanized means to dig up soil is intended to be regulated by a § 404 Permit.

In response, the Plaintiffs cite to numerous engineering definitions of dredging and a related concept, sluicing, which is generally defined as "caus[ing] water to flow at high velocities for wastage, for purposes of excavation, ejecting debris, etc." (Pltf's Brief in Support of Motion for PSJ, p. 5), to support their contention that the use of non-mechanized means such as hydraulics may be considered dredging under the CWA. Plaintiffs also refute the Defendants reliance on the CWA regulations claiming that those regulations merely supply examples of when mechanized means of dredging may be regulated but do not purport to extend § 404 protection only to mechanized dredging.

██ By framing the issues in this way, the parties have asked the court to determine the legislative intent of Congress when it enacted § 404. The starting point when determining the intent of Congress is the language of the statute itself. See *United States v. Hayward,* 6 F.3d 1241, 1245 (7th Cir.1993). When the intent of a statute is clear, the court must give effect to the unambiguously expressed will of Congress. See *Am. Fed'n of Gov't Employees v. Rumsfeld,* 262 F.3d 649, 655–56 (7th Cir.2001). However, when, as is the case here, the statute is silent or ambiguous with respect to a material issue, the court should defer to the agency's interpretation so long as that interpretation is based on a permissible construction of the statute. See *id.* at 656 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Here, Congress has not defined what acts it intended to regulate as "dredging" and thus, the court turns now to the EPA regulations to determine its interpretation of when a "discharge of dredged materials" occurs.

In 1977 the Corps promulgated regulations that generally tracked the statutory language in 33 U.S.C. § 1344(a). These regulations defined "discharge of dredged material" as "any addition of dredged ma-

terial into the waters of the United States," with a few limited exceptions. 42 Fed.Reg. 37,145 (July 19, 1977); *National Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1402 (D.C.Cir.1998). "A new regulation issued in 1986 exempted from the permit requirement '*de minimis*, incidental soil movement occurring during normal dredging operations.'" *Id.* (citing 51 Fed.Reg. at 41,232). In 1993, in response to a lawsuit, *North Carolina Wild Life Federation v. Tulloch*, Civ. No. C90–713–CIV–5–BO (E.D.N.C.1992), the Corps crafted what has come to be known as the Tulloch Rule. The Tulloch Rule altered the preexisting regulatory framework primarily by removing the *de minimis* exception and by adding coverage of incidental fallback. Specifically, the rule defined "discharge of dredged material" to include "[a]ny addition, including any redeposit, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation." *National Mining Assn.*, 145 F.3d at 1402. However, in *National Mining Assn.*, the court invalidated this rule stating that the Corps exceeded its statutory authority. This resulted in the most recent amendment which is, at present, relevant to the discussion in this case.

In the most recent formulation, effective April 2001,[11] the Corps modified its definition of discharge of dredged material "in order to clarify what types of activities we believe are likely to result in regulable discharges...we believe that the use of mechanized earth moving equipment to conduct landclearing, ditching, channelization, in-stream mining, or other mechanized excavation activity in waters of the U.S. is likely to result in regulable dis-

charges of dredged material." 66 Fed. Reg. 4550, 4552 (January 17, 2001). "The rule now provides that the agencies regard the use of mechanized earth-moving equipment to conduct landclearing, ditching, channelization, in-stream mining or other earth-moving activity in waters of the U.S. as resulting in a discharge of dredged material unless projectspecific evidence shows that the activity results in only incidental fallback." *Id.* After this regulation, the "discharge of dredged material" means:

> ...any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States. The term includes, but is not limited to, the following:
>
> (i) The addition of dredged material to a specified discharge site located in waters of the United States;
>
> (ii) The runoff or overflow from a contained land or water disposal area; and
>
> (iii) Any addition, including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation.

33 C.F.R. § 323.2(d)(1).

Citing to the newest regulation, Defendants urge that this rule makes it clear "that when the EPA refers to 'discharge of dredged material' they are referring to the use of '*mechanized*' earth moving equipment" and not hydraulic dredging. Defendants also indicate that the redeposit of materials downstream in this case was an unintentional consequence of raising the dam and thus, it is not akin to the type of

11. This regulation was not in effect at the time the events relating to this lawsuit took place. However, the regulation is instructive on the intent of the EPA in interpreting this provision of the CWA.

conduct sought to be regulated when there is the purposeful use of mechanized earth moving equipment. Plaintiffs respond that this regulation merely makes it clear that the use of *mechanized* earth moving equipment (unless it involves only incidental fallback) [12] clearly falls within the scope of the § 404 permitting requirements but that this is not the only form of dredging contemplated by the regulations.

Addressing first the contention that the redeposit in this case was unintentional, the newest regulations reiterate that "there is no support under the CWA for the position that a discharge must be an intentional act." 66 Fed.Reg. 4550, 4554. This fact has been reiterated in the case law. *United States v. Gulf Park Water Co., Inc.,* 972 F.Supp. 1056, 1059 (S.D.Miss.1997)("[C]ompliance with the CWA is a matter of strict liability. Therefore, a defendant's intentions to comply or a good faith effort to do so do not excuse a violation."); *United States v. Winchester Municipal Utilities,* 944 F.2d 301, 304 (6th Cir.1991); *Hawaii's Thousand Friends v. City and County of Honolulu,* 821 F.Supp. 1368, 1392 (D.Haw.1993); *United States v. Ohio Edison Co.,* 725 F.Supp. 928, 934 (N.D.Ohio 1989). Thus, the unintentional nature of the discharge downstream is a non-factor in the analysis.

As for Defendants' position that the permitting process was intended to apply only to *mechanized* means of dredging, there is simply no support for this proposition. The new regulations were intended to clarify the EPA's view that activities involving mechanized earth-moving equipment typically result in more than incidental fallback and thus, such activities tend, with few exceptions, to require a § 404 permit. *See* 66 Fed.Reg. at 4552. There is nothing in either the statutory language itself or in the regulations that suggest that the same type of activity sought to be regulated by § 404 as it relates to mechanized dredging could not occur by means that were hydraulic and likewise be regulated. Indeed, even the Defendants' own proposed definition of "dredging," that is, "to clean or dig up with or *as if with* a dredge," (emphasis added) permits a conclusion that non-mechanical means could cause dredging if the result was the same as with a dredge. Thus, the court concludes that the term "discharge of dredged materials" includes dredging that occurs by means of hydraulics, as in the present case.

This court's conclusion is bolstered by the Seventh Circuit's holding in *Froebel* wherein the court held with respect to Froebel's § 404 claim that "it is not at all difficult to imagine that water could be used to dredge or fill a riverbed when a person directs the water for that purpose." *Froebel,* 217 F.3d at 938. In that case, a case markedly similar to this one, Froebel sued Waukesha County, Wisconsin ("the County") and the Wisconsin Department of Natural Resources ("WDNR") for CWA permitting violations, after the WDNR removed the Funk's Dam. The consequences of the dam's removal were severe—the local flora was buried under a foot of silt and sediment that was deposited into the Oconomowoc River. In discussing Froebel's § 404 claim, the Seventh Circuit indicated that dredging cannot be a purely passive activity and that liability under § 404 requires some action on the part of the defendants. *Froebel,* 217 F.3d at 938.

---

12. " "Incidental fallback" is used in the regulations as meaning the " 'small volumes of dredged material' " falling back to substantially the same place as the initial removal." 66 Fed.Reg. at 4553. One case has described "incidental fallback" as "the minor displacement of soil caused by landclearing operations, also known as "bucket drippings" that fall from equipment as earth is excavated." *United States v. Sartori,* 62 F.Supp.2d 1362, 1365.

The Seventh Circuit then dismissed the County defendant because it merely owned the land and did not engage in the removal of the dam. As for the WDNR defendants, the Seventh Circuit indicated that "it is possible that the state defendants have engaged in unlawful dredging by removing Funk's Dam and allowing the Oconomowoc River to clean out the impoundment..." *Id.* at 939. Unfortunately, for Froebel, the Seventh Circuit never reached an ultimate conclusion on his claim against the WDNR defendant because it concluded that claim preclusion barred Froebel's claim against it. However, this case is nonetheless instructive because the Seventh Circuit recognized the possibility that the use of hydraulics to dredge and redeposit materials downstream was intended to be regulated by a § 404 Permit. Thus, that case confirms this court's conclusion that hydraulic dredging, which the Defendants *admit* occurred here, falls within the types of activities subject to regulation under § 404.

■ Next, the court turns to an examination of whether any exclusion applies for the hydraulic dredging that occurred here. The parties are in agreement that if the maintenance exclusion under § 1344(f)(1)(B) applies and no recapture has occurred, no permit was required and no violation of the CWA occurred. Likewise, if the maintenance exclusion did apply but the recapture provision is applicable, then a permit was required and the Defendants violated the CWA.

■ A defendant claiming an exemption under 33 U.S.C. § 1344(f) bears the burden of proving that its activities are exempt from regulation. *See Sargent County,* 876 F.Supp. at 1097 (citing cases). To be exempt from the permit requirements, Defendants must demonstrate that the questioned activity satisfies the requirements of § 1344(f)(1) and avoids the recapture provision in § 1344(f)(2). Thus, here, the Defendants must show that the raising of the lower gate was for maintenance of the dam and that this work is not "recaptured" under § 1344(f)(2).

With respect to the applicability of the maintenance exclusion at all, Defendants urge that they lowered the dam solely for the purpose of making a maintenance inspection of the dam control gates and to perform maintenance to a related intake valve and thus, any discharge of dredged materials occurred solely as a result of this maintenance. In response, Plaintiffs do not seriously question the Defendants' claim that they were conducting maintenance on the dam [13] but instead choose to rely upon one sentence in the regulations that states that "maintenance does not include any modification that changes the character, scope, or size of the original fill design ..." 33 C.F.R. § 323.4(a)(2). What this means, according to the plaintiffs, is that any dredged materials which were discharged beyond the point of the maintenance work, i.e., the dam, would not fall within the maintenance exception because the discharge exceeded the original fill design. Plaintiffs further argue that under the statutory language the "discharge of dredged materials" itself must be "for the purpose of maintenance" not the "result of" maintenance. Responding to these arguments, the Defendants assert that the regulation's reference to "original fill design" means the dam structure itself, and the size of the impounded waters, i.e., the reservoir or supply pond. Defendants fur-

---

13. Throughout their various briefs, the Plaintiffs make unsupported allegations that the Defendants were "pretending" to make repairs to the dam when they lowered the flow-control gates. Plaintiffs have not supported these factual assertions with any evidence nor have they contested at all, the factual basis submitted by the Defendants which discusses the chain of events prior to the draw-down.

ther urge that no change occurred to either the size of the supply pond or the dam itself and thus, the "original fill design" was not changed as a result of the maintenance.

The court has considered the parties' arguments and concludes that the maintenance exclusion applies to the activities in this case. The record is undisputed that the purpose of the draw-down was maintenance related and the Plaintiffs have cited to no cases or regulatory authorities which define "original fill design" in the manner they suggest. If this court were to adopt such an interpretation, it is questionable whether any activity or repair on a dam could ever qualify as "maintenance" under the CWA—a result this court does not believe was intended by the legislation. Here, the record is clear and undisputed that there were problems with the intake valve and the dam control mechanisms that required the Defendants to perform maintenance on the dam. The maintenance to the dam structures would not (and did not) change the character, scope or size of the reservoir nor did it permanently alter the character or size of the supply pond and plaintiffs have presented no evidence to the contrary. Thus, this court concludes that the activities here fall squarely within the exceptions for dam maintenance.[14]

▮▮▮ Having concluded that the maintenance exception does apply here, the court turns now to the recapture provision in § 1344(f)(2). Section 1344(f)(2) provides:

Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

*Id.*

Defendants urge that the recapture provision does not apply because any "discharge of dredged materials" was incidental to dam maintenance which did not have *as its purpose* changing the use of the Fawn River. Plaintiffs address this argument but their exact point is difficult, even after supplemental briefing, to comprehend. From what the court can discern, Plaintiffs' argument is that when assessing whether the maintenance had "as its purpose bringing an area of the navigable waters into a use to which it was not previously subject" the court may not make a subjective inquiry into the intentions of the Defendants in conducting the maintenance on the dam but must look objectively at the effect of the maintenance on downstream waters. *See Pltfs' Supplemental Response,* p. 6. (citing, *United States v. Sargent County Water Resource,* 876 F.Supp. 1090, 1101 (D.N.D.1994)).

*Sargent* involved a dispute between the United States and Sargent County Water Resource District ("the County") over

---

**14.** This conclusion is not altered by Plaintiffs' contention that the "discharge of dredged materials" itself must be "for the purpose of maintenance." Indeed, the regulations belie this argument. The regulations provide that any discharge of dredged or fill material *that may result from* any of the following activities is not prohibited by or otherwise subject to regulation under section 404:

(a)(2) Maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, bridge abutments or approaches, and transportation structures

(emphasis added). Thus, it appears clear to the court that a discharge that *results from maintenance,* which is what occurred here, would fall squarely within the maintenance exception.

work the County did on a drainage ditch that bisected three sloughs before draining into the Wild Rice River in Brampton, North Dakota. The County cleaned out the existing drainage ditch and claimed that this work constituted "maintenance" so as to fall within the § 1344(f)(1) exception for maintenance. The Government, however, claimed that the clean-out went beyond maintenance and was actually an "improvement" which required a permit. The Court, in language worth quoting, distinguished a line of cases addressing other § 1344 exemptions, and concluded that the clean out qualified as maintenance stating:

> There are important factual differences between these cases and the one presented here. In each of these cases in which the defendants claim a normal farming or drainage ditch exemption under § 1344(f)(1)(A) or (C), the defendants were undertaking a large-scale conversion of a wetland area by removing existing vegetation, deposition dredged or fill material into low-lying areas in an attempt to convert the areas to agricultural use, or constructing drainage ditches in order to remove water from wetlands. In each of these cases, large amounts of dredged or fill material was redeposited within the wetland for the clear purpose of converting the wetland. In most instances, the defendants had recently acquired the property in question and were attempting to add value to the land. Although each of the defendants stated a purpose facially worthy of an exemption, it was clear by their actions that the only 'purpose' each had was to circumvent the Act.

> The facts in the instant case are different. There was an existing ditch and the County wanted it cleaned out...The

court has previously noted that the stated purpose was confirmed by the actions of those who performed work on the drain...

> As noted previously, reviewing courts have consistently looked beyond the stated or subjective intentions and determined the effect or "objective" purpose of the activity conducted. In this case, the "objective" purpose was consistent with the county's stated intentions

*Id.* at 1101–1102.[15]

For the sake of argument, the court shall presume, as Plaintiffs' urge that an objective standard, such as the one described in *Sargent* is the correct one. Even with this assumption, however, the Plaintiffs have submitted no evidence, much less evidence warranting summary judgment in their favor, which establishes that the stated purpose of the maintenance, i.e. to repair an intake valve, was inconsistent with the objective actions of the Defendants. The record is replete with evidence that the Defendants sole objective in raising the flow control gates was to inspect the dam and perform maintenance. The unrefuted record indicates that the Defendants documented the maintenance problems with the dam and consulted with others on how to repair those problems. There is simply nothing to suggest, as Plaintiffs appear to contend, that the maintenance of the dam was a "hoax" or a "front" for the Defendants to clean out the Reservoir and damage the Plaintiffs.

Plaintiffs also make allegations that in 1994–1995, the Defendants chemically eradicated some vegetation in the Reservoir and that this constitutes a purposeful "change in use" which was subsequently completed by the draw-down of the Reser-

---

**15.** The court questions whether the above language in *Sargent* was intended to apply to the recapture provisions at all, as Plaintiff argues, since the quoted language in *Sargent* ad-

dressed whether the maintenance exception in § 1344 applied at all not whether recapture applied.

voir. First, the Plaintiffs fail to explain how these two events are related let alone present any proof that the two events are, in fact, related or one in the same. Second, the recapture provision states that a discharge "incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section." Here, the activity complained of throughout this litigation has been the maintenance performed on the dam in May 1998—not chemical eradication of vegetation in 1994–1995. A literal reading of the provision requires that the maintenance have as its purpose changing the use of navigable waters. Here, as this court has emphasized, there is simply no evidence that the maintenance done by the Defendants had any purpose other than maintenance. Therefore, the court concludes that no recapture occurred as a matter of law.

Accordingly, because the Court concludes that the maintenance exception applies and no recapture has occurred, the Defendants were not required to have a § 404 permit at the time they performed maintenance on the dam. Thus, the Plaintiffs' Motion for Partial Summary Judgment on their § 404 CWA claim is DENIED; the Defendants' Motion for Summary Judgment on this claim is GRANTED.

## B. *Discharge of a Pollutant as Required for a § 402 Permit* [16]

 Plaintiffs alternatively claim that the Defendants should have had a § 402 Permit before discharging pollutants downstream from the dam. The starting point for this analysis involves an initial determination of whether the activities in question here constitute a "discharge of pollutants" subject to regulation under the CWA's § 402 permitting requirements. As summarized above, the CWA regulates only the discharges of pollutants into the navigable waters of the United States. Thus, absent the discharge of a pollutant, neither the CWA or its permitting requirements are implicated. It is for this reason that the parties' arguments center on this requirement.

"Discharge of a pollutant" is defined in the act as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Point source" is defined by the Act to mean: "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged," 33 U.S.C. § 1362(14) and several courts have concluded that a dam can serve as a point source. *See Froebel v. Meyer,* 217 F.3d 928, 937 (7th Cir.2000) (citing cases). The Act defines a "pollutant" as, among other things, "dredged spoil..., rock, sand... discharged into water." 33 U.S.C. § 1362(6).

The Defendants claim that the sediment discharged through the dam is not a "pollutant" under § 1362(6) and that they did not "discharge (add) a pollutant" into the Fawn River as that term is defined in § 1362(12) because "[t]hose constituents occurring naturally in the waterways... do not constitute an addition of pollutants ..." *Appalachian Power Co. v. Train,* 545 F.2d 1351, 1377 (4th Cir.1976). The Defendants further argue that the sediments deposited into the Fawn River were discharged through the flow control gates of

---

**16.** It is critical to note that civil liability under the Clean Water Act is strict and neither mere negligence or lack of knowledge will preclude liability. *Kelly v. U.S. EPA,* 203 F.3d 519, 522 (7th Cir.2000) (citing cases). Thus, the Plaintiffs do not have to prove intent to prevail on their claims.

a dam and dam discharges are not intended to be regulated by the CWA. *Gorsuch,* 693 F.2d 156.

In response, the Plaintiffs' theory is rather uncomplicated; they claim that the dam operated by the Defendants trapped large quantities of sediment (consisting of sand and other pollutants defined in the Act) and that the Defendants, by raising the dam, deposited or "added" the sediment into the Fawn River. Thus, they contend that the Defendants should have had a permit before raising the lower gate of the dam.

The Plaintiffs' theory is not a novel one and has been raised, albeit in different contexts, in several cases. *See Froebel,* 217 F.3d 928; *Borden Ranch Partnership v. United States Army Corps of Engineers,* 261 F.3d 810, 813 (9th Cir.2001); *United States v. Deaton,* 209 F.3d 331 (4th Cir.2000); and *National Wildlife Federation v. Gorsuch,* 693 F.2d 156 (D.C.Cir. 1982). For instance, the plaintiff in *Gorsuch,* the National Wildlife Federation, sought an injunction ordering the EPA Administrator to require NPDES permits for all dams as a nondiscretionary matter. The plaintiff argued broadly that any dam-induced change in water quality involves a "pollutant" and that release of polluted water through a dam into downstream waters constitutes an "addition" of a pollutant

from a point source under 33 U.S.C. § 1362(12)[17], requiring a § 402 permit. *Id.* at 165. The EPA argued for a narrower reading of § 1362(12), which would require § 402 permits for dams only in certain circumstances. Specifically, the EPA's position was that an "addition" of pollutants from a point source within the meaning of § 1362(12) "occurs only if the point source itself physically introduces a pollutant into water from the outside world." Id. at 174–75. The District of Columbia Circuit upheld the EPA's interpretation of the relevant statutory terms, finding it reasonable and consistent with legislative intent, and therefore entitled to great deference. Id. at 183.[18] Thus, the court held that no § 402 Permit was required since a pollutant was not physically introduced "into the water from the outside world." *Id.* at 175.

In line with the holding in *Gorsuch,* numerous cases have reached similar conclusions. For instance in *National Wildlife Federation v. Consumers Power Co.,* 862 F.2d 580 (6th Cir.1988), the Sixth Circuit held that a hydro-electric facility's movement of pollutants already in the water did not amount to an "addition of pollutants" so as to require a NPDES permit. As part of this conclusion, the Sixth Circuit reasoned that a hydroelectric facility's release of dead fish was not an addition of a

---

17. 33 U.S.C. § 1362 is the definition section of the Clean Water Act. Section 1362(12) provides: "(B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft."

18. In coming to this conclusion, the D.C. Circuit explained the process of how a dam traps sediment within a reservoir and eventually deposits it downstream—essentially mirroring the process that occurred in the present case:

Generally, large reservoirs act as sediment traps; the water velocity decreases (compared to the upstream river) and sediment settles to the bottom of the reservoir. Thus,

water released from the dam will contain less sediment than upstream water. This is generally viewed as an improvement in water quality. However, the river will 'tend to restore its equilibrium [sediment] loading by scouring the downstream channel.' Also, the reservoir will tend to fill with sediment, which in some cases can require periodic dredging or sluicing. Dredging may temporarily increase the sediment load in the reservoir (and hence in the downstream water); sluicing is a deliberate attempt to have the river carry accumulated sediment downstream.

*Id.* at 163.

pollutant requiring a § 402 permit because the fish were already in the water (albeit alive) before being killed in the dam's own power generating turbines. *Id.* at 581.

Similarly, the Ninth Circuit, in *Committee to Save Mokelumne River v. East Bay Mun. Util. District*, 13 F.3d 305 (9th Cir. 1993), held that a NPDES permit was required where a dam structure collected polluted surface runoff from an abandoned mine site and channeled it into the dam reservoir. The Court distinguished *Gorsuch* and *Consumers Power Co.*, stating:

> This case clearly is distinguishable from Gorsuch and Consumers Power Co. because the Penn Mine facility does not pass pollution from one body of navigable water into another. Rather, the source of pollution added to the Mokelumne River is "surface runoff that is collected or channelled by" defendants from the abandoned mine site. Such surface runoff is expressly listed under the definition of "discharge of a pollutant" contained in the regulations. See 40 C.F.R. § 122.2 ("Discharge of a pollutant means ... additions of pollutants into waters of the United States from: surface runoff which is collected or channelled by man").

*Id.* at 308. The court noted two significant facts which distinguished the case from the facts in *Gorsuch*. First, the defendants admitted that acid mine drainage from the abandoned mine site was channeled into and collected in the dam. Second, the defendants admitted that water and drainage collected in the dam and passed over the spillway into the Mokelumne River and Camanche Reservoir. Thus, it was clear to the Ninth Circuit that an addition of a pollutant requiring a § 402 Permit occurred.

A more recent line of cases, however, calls into question the concept that a "discharge of pollutants" cannot occur if the pollutant was not physically introduced "into the water from the outside world." In *Rybachek v. United States Envtl. Protection Agency*, 904 F.2d 1276, 1285 (9th Cir.1990), the Ninth Circuit concluded that placer mining in waterbeds, which involves excavating sediment and running it through a sluicing process that releases water with high concentrations of suspended toxic metals back into the river or stream, caused an "addition" such that a discharge of pollutants had occurred, subject to CWA regulation.

In *United States v. Deaton*, 209 F.3d 331 (4th Cir.2000), a property owner alleged that the Corps could not regulate "sidecasting"—the deposit of excavated material from a wetland back into that same wetland. The property owner argued that the process of sidecasting did not result in a net increase in the amount of material present in the wetland and therefore nothing was "added" to the wetland that was not there previously. Under the property owners' theory, "no pollutant is discharged unless there is an 'introduction of new material into the area, or an increase in the amount of a type of material which is already present.'" The Fourth Circuit rejected this argument stating:

> Contrary to what the Deatons suggest, the statute does not prohibit the addition of material; it prohibits the 'addition of any pollutant.' The idea that there could be an addition of a pollutant without an addition of material seems to us entirely unremarkable, at least when an activity transforms some material from a nonpollutant into a pollutant, as occurred here. In the course of digging a ditch across the Deaton property, the contractor removed earth and vegetable matter from the wetland. Once it was removed, that material became 'dredged spoil,' a statutory pollutant and a *type* of material that up until then was not present on the Deaton property. It is of no consequence that what is now dredged

spoil was previously present on the same property in the less threatening form of dirt and vegetation in an undisturbed state. What is important is that once that material was excavated from the wetland, its redeposit in that same wetland added a pollutant where none had been before.

*United States v. Deaton,* 209 F.3d at 335.

In the most recent case addressing this issue, *Borden Ranch Partnership v. United States Army Corps of Engineers,* the Ninth Circuit relying on its own precedent in *Rybachek v. U.S. EPA,* 904 F.2d 1276 (9th Cir.1990) and the Fourth Circuit's holding in *Deaton* concluded that the process of "deep ripping" which churns up soil that is already present and replaces it in the same location constitutes an addition of a "pollutant" within meaning of Act despite the fact that the soil was not physically introduced into the water from somewhere else. The court, referring to *Rybachek* and *Deaton,* stated:

> These cases recognize that activities that destroy the ecology of a wetland are not immune from the Clean Water Act merely because they do not involve the introduction of material brought in from somewhere else. In this case, the Corps alleges that Tsakopoulos has essentially poked a hole in the bottom of protected wetlands. That is, by ripping up the bottom layer of soil, the water that was trapped can now drain out. While it is true, that in so doing, no new material has been 'added,' a pollutant has certainly been 'added.' Prior to the deep ripping, the protective layer of soil was intact, holding the wetland in place. Afterwards, that soil was wrenched up, moved around, and redeposited somewhere else. We can see no meaningful distinction between this activity and the

activities at issue in *Rybachek* and *Deaton.*

*Id.* at 814–815.

Applying these most recent cases to the present scenario, the Plaintiffs' claim that sediment which is actively excavated and replaced into the same body of water constitutes a "discharge of a pollutant" requiring a § 402 permit has some teeth. Where the Plaintiffs claim fails, however, is in their failure to show any active removal or excavation of the sediment in the present case and its "redeposit" into the Fawn River as was the case in *Borden, Deaton,* and *Rybachek.* Indeed, each of these cases involved activities having as their very design movement and excavation of soil and sediment. Under such circumstances, these cases clearly support the proposition that the purposeful active dredging of waterbeds by mechanized devices and a *removal* and *replacement* of the materials already present in the wetland is an "addition of a pollutant." This simply did not occur here. Any "churning" or movement of the soil or sediment in this case was entirely incidental to a maintenance activity that had no purpose of excavating and redepositing soil downstream. Thus, the court concludes that no "discharge of pollutants" occurred in this case so as to warrant a § 402 Permit. Defendants' Motion for Summary Judgment is GRANTED as to Plaintiffs' Claim that a § 402 Permit was required.

### Section 1983 Claims

Initially, the Plaintiffs alleged that the Defendants' actions violate the First, Fourth, Fifth and Fourteenth Amendments. On November 20, 2001, Plaintiffs filed a Motion for Partial Dismissal dismissing their § 1983 claims implicating the First and Fourth Amendments as well as their claim for violation of the Equal Protection clause. This motion will be GRANTED. Thus, the remaining § 1983

claims allege a taking without just compensation under the Fifth Amendment and a violation of the Fourteenth Amendment's guarantee to due process. Defendants have moved for summary judgment on both of these remaining claims [19] and it is to these claims the court now turns.

 Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Section 1983 is not a source of substantive rights but instead provides "a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994). To prevail on a claim under section 1983, plaintiff must therefore show "(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir.1996). The parties in this case have conceded that the defendants acted under color of state law, "but in any given § 1983 suit, the plaintiff must still prove a violation of the underlying constitutional right; and depending on the right, merely negligent conduct may not be enough to state a claim." *Daniels v. Williams*, 474 U.S. 327, 344, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

**A. *Fifth Amendment Takings Claim***

 The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897), prohibits the government from taking private property for public use without just compensation. This constitutional guarantee exists to prevent the government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). With this underlying principle in mind, "[t]he clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S.Ct. 2448, 2457, 150 L.Ed.2d 592 (2001). Indeed, "even a minimal 'permanent physical occupation of real property' requires compensation under the Clause". *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982)). Further, state action that "denies all economically beneficial or productive use of land" will require compensation under the Takings Clause. *Id.*

In *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the Supreme Court held that a takings claim does not accrue until available state remedies have been tried to no avail. Indeed, the Seventh Circuit has construed *Williamson's* exhaustion requirement strictly, warning that "[l]itigants who neglect or disdain their state remedies are out of court, period," *River Park Inc., v. City of Highland Park*, 23 F.3d 164, 165 (7th Cir.1994). Most recently in *SGB Financial Services, Inc. v. Consolidated City of Indianapolis–Marion County, Indiana*, 235 F.3d 1036, 1037–1038 (7th Cir.2000), the Seventh Circuit

**19.** Plaintiffs have not cross-moved for summary judgment on these claims.

considered a takings claim brought by SGB, an entity owning 26 buildings in the Timber Ridge Apartment complex that the City of Indianapolis put on its "acquisition list" of properties that the city planned to acquire. SGB asserted that by simply "listing" these properties on the acquisition list, the City had accomplished a taking. The Seventh Circuit dismissed SGB's claim because the plaintiff failed to take advantage of Indiana's inverse condemnation proceedings before filing the federal suit. In coming to this conclusion, the court looked to *Williamson* and explained the rationale as follows,

> Indiana has authorized inverse-condemnation actions (that is, property owners' suits seeking compensation for what they say are takings). I.C. § 32–11–1–12. Because the takings clause of the fifth amendment (applied to the states by the fourteenth, see *Chicago, Burlington & Quincy R.R. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897)), does not forbid takings but simply requires "just compensation" for the property, a state violates the Constitution only by refusing to pay up. If the state offers a forum that will decide whether a taking has occurred and, if so, will fix just compensation—that is, if the state entertains inverse-condemnation suits—it is hard to see how the state could be thought in violation of the Constitution. And if the state is not violating the Constitution, there is no basis for relief under § 1983. This is the chain of reasoning behind *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), which held that a takings claim does not accrue until available state remedies have been tried and proven futile. "Available" is an important qualifier. If the state does not offer just compensation even for admitted takings then there is a real constitutional problem. But Indiana offers financial relief via inverse–condemnation suits.

*SGB,* 235 F.3d at 1038.

"*Williamson* mandates the satisfaction of two requirements: (1) the 'Final Decision Requirement': the plaintiff must demonstrate that he or she received a 'final decision' from the relevant government entity, 473 U.S. at 186–87, 105 S.Ct. 3108; and (2) the 'Exhaustion Requirement': the plaintiff must have sought 'compensation through the procedures the State has provided for doing so.'" *Forseth v. Village of Sussex,* 199 F.3d 363, 372 (7th Cir.2000) (citing *Williamson,* 473 U.S. at 194, 105 S.Ct. 3108). These two requirements often overlap, but the absence of either is dispositive of a plaintiff's claim. In this case, the Plaintiffs have provided no evidence that they have sought redress through Indiana's inverse condemnation statutes, a remedy that was available to them prior to filing this suit. Their failure to pursue such a claim through the state means, as was the case in *SGB,* that no constitutional violation has yet occurred. As a result, any takings claim is not ripe for adjudication and barred by *Williamson* and the Seventh Circuit's decision in *SGB.* Accordingly, the Defendants' Supplemental Motion for Summary Judgment on the Plaintiffs' Fifth Amendment Takings Claim will be GRANTED.

**B. *Due Process***

 The Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law...." U.S. CONST. amend. XIV, § 1. The Due Process Clause has a procedural component and a substantive one. "The two components are distinct from each other because each has different objectives, and each imposes different constitutional limitations on government power." *Howard v. Grinage,* 82 F.3d 1343, 1349

(6th Cir.1996).[20] "Although both substantive and procedural due process violations must "deprive" an individual of a protected constitutional interest, and the deprivation must be "arbitrary in the constitutional sense," *Collins v. City of Harker Heights,* 503 U.S. 115, 129, 112 S.Ct. 1061, 1071, 117 L.Ed.2d 261 (1992), each imposes upon a plaintiff a different burden to state a cognizable claim." *Id.* at 1349. "Arbitrary in the constitutional sense" for procedural due process purposes means conduct undertaken with something more than negligence. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

Plaintiffs claim that they were entitled to pre-deprivation notice of the intended actions by the Defendants and a hearing pursuant to Indiana Code 14–26–2–6 [21] and Indiana Code § 14–26–2–10.[22] In response, the Defendants fail to acknowledge these statutes or indicate why they are inapplicable to the facts here, and instead argue that Indiana law does not provide for any notice or hearing before draining a lake and, in any event, there is no evidence of intentional conduct by the Defendants demonstrating that their actions were "arbitrary in the constitutional sense."

Setting aside the Defendants' tenuous argument that state law does not require a permit or notice before altering the level of a freshwater lake, the court turns first to whether there is evidence that the Defendants acted with the required state of mind to warrant a due process violation. As noted above, in *Daniels v. Williams,* the Supreme Court held that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels,* 474 U.S. at 328, 106 S.Ct. 662. "The rationale for the *Daniels* decision is a powerful one. The term 'deprive,' as employed in the Fourteenth Amendment, suggests more than a mere failure to take reasonable care: it connotes an intentional or deliberate denial of life, liberty, or property." *Pink v. L. T. Lester,* 52 F.3d 73, 74 (4th Cir.1995) (citing *Daniels,* 474 U.S. at 330, 106 S.Ct. at 664 (quoting *Parratt,* 451 U.S. at 548–49, 101 S.Ct. at 1919–20 (Powell, J., concurring))). Indeed, in deciding *Daniels,* the Supreme Court founded its conclusion on the fact that negligent acts by state officials involve no affirmative abuse of governmental power—which is, after all, what the Due Process Clause was meant to prevent. *Daniels,* 474 U.S. at 331–32, 106 S.Ct. 662.

This elementary lesson—that negligent deprivations of life, liberty, or property are not actionable under 42 U.S.C. § 1983—is applicable to the allegations made by the Plaintiffs here. The Defendants assert that there is no evidence to support the

---

**20.** "A procedural due process limitation, unlike its substantive counterpart, does not require that the government refrain from making a substantive choice to infringe upon a person's life, liberty, or property interest. It simply requires that the government provide "due process" before making such a decision." *Howard,* 82 F.3d at 1349. "Substantive due process, on the other hand, serves the goal of preventing "governmental power from being 'used for purposes of oppression,' " regardless of the fairness of the procedures used." *Id.* (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)).

**21.** Indiana Code § 14–26–2–6 provides that "A person may not change the level of the water ... of a public freshwater lake by: (1) excavating; (2) filling in; or otherwise causing a change in the area or depth of ...the lake below the waterline or shoreline, without having a written permit issued by the department."

**22.** Indiana Code § 14–26–2–10 provides that "...the department may not authorize: (1) the changing of the level...of a public freshwater lake without giving notice and the opportunity for a public hearing at the county seat of the county in which the lake is located..."

notion that their May 18, 1998 actions were intended to harm the Plaintiffs or were even reckless. In turn, the Plaintiffs brief focuses on several facts that they contend demonstrate that the Defendants acted, at the very least, recklessly. Plaintiffs state, for instance, that the Defendants should have drained the reservoir more slowly (no more than 12″ per day) and/or used one of three alternative ways of draining the reservoir, that they lacked training, education and experience in the draw-down of reservoirs, and that the Defendants had some knowledge that raising the lower gate would cause a release of sediment. Plaintiffs also point out that the Defendants observed sediment releasing into the Fawn River during the draw-down process and did not immediately close the gate and continued to refuse to close the gate even after complaints by at least one Plaintiff. Finally, Plaintiffs assert that the Defendants claim that they intended to make repairs after lowering the gate was a sham since no repairs were made on May 18, 1998. Based upon these facts, Plaintiffs claim that a question of fact remains concerning whether the Defendants acted intentionally to deprive them of their property.

■ Perhaps in hindsight the Defendants should have utilized an alternative method for the draw-down, completed the process more slowly, or sought the aid of the various experts Plaintiffs rely upon.

Yet, their failure to do so does not, without more evidence, support a reasonable inference that the Defendants engaged in the draw-down for any nefarious purpose, or that they were even reckless in doing so. Plaintiffs have pointed to no facts which demonstrate any culpable state of mind by the Defendants when they opened the lower gate of the dam on May 18, 1998. Rather, the facts support the view that the Defendants, had they used more care, could have completed the draw-down in an alternative way without harming the Plaintiffs' interests in the Fawn River. For Plaintiffs to survive summary judgment on this claim "the defendant must make a deliberate choice; an inadvertent omission won't do," *West By and Through Norris v. Waymire*, 114 F.3d 646, 651 (7th Cir.1997) (citing *Board of County Commissioners v. Brown*, 520 U.S. 397, 414–17, 117 S.Ct. 1382, 1394, 137 L.Ed.2d 626 (1997)), and, as this court has already stated, injury caused by a failure to use due care is not redressable under a due process theory, see *Daniels*, 474 U.S. at 330–31, 106 S.Ct. 662; *Ruehman v. Sheahan*, 34 F.3d 525, 528 (7th Cir.1994) (holding that Plaintiffs might "win on a state-law negligence theory, but errors of state law do not automatically violate the Constitution…"). From the facts as set forth by the Plaintiffs there is simply no evidence that the Defendants' conduct was anything other than negligent.[23] Thus, for this reason, their procedural due process claim fails.

**23.** Plaintiffs persist in their argument that the Defendants knew before they began the draw-down that sediment would be "cut out" of the reservoir and deposited into the Fawn River and that this act was in retaliation for prior encounters between the Plaintiffs and the Defendants. To support this contention, Plaintiffs point to the post-drawdown comments to Plaintiffs' counsel as he was jogging and to the fact that the Defendants knew of the Plaintiffs' annual Memorial Day celebration. However, the facts simply do not support the Plaintiffs' contentions. The record is devoid of any evidence that the Defendants knew of

any annual party or that their intent was to destroy this festive occasion. Rather, this is mere speculation by the Plaintiffs. Further, the statement made to Neal Lewis is anything but a smoking gun establishing intentional conduct on the Defendants' part. Finally, while it is true that Meyer and Clary testified that they knew some sediment, by the very nature of the process, would be drawn into the Fawn River, there is absolutely no evidence suggesting either that the purpose of the draw-down was to intentionally deposit sediment into the Fawn River or that the

More importantly, even if the acts alleged were intentional as Plaintiffs allege, this does not violate due process so long as adequate state post-deprivation remedies are available. *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Here, Plaintiffs brief altogether fails to address why state post-deprivation remedies were inadequate nor do they set forth any legal analysis on this point. This failure is likewise fatal to their claim of a procedural due process violation. Thus, Defendants' Motion for Summary Judgment of the Plaintiffs' procedural due process claim is GRANTED.

### Defendants' Motions to Strike

Defendants have also filed a motion to strike portions of various affidavits submitted by the Plaintiffs on a host of different grounds. As best as the court can discern, these affidavits relate to § 1983 claims that have been voluntarily dismissed by the Plaintiffs and/or the objections by the Defendants have not been relevant to the court's analysis. As a result, the Defendants' Motion to Strike Affidavits (Docket # 115) is DENIED. In addition, Defendants' Motion to Strike Refiled Notice of Objections to Statement of Genuine Issues (Docket # 118) is DENIED.

### Defendants' Motion to Reserve Right to Disqualify Plaintiffs' Counsel

Finally, Defendants filed a motion to reserve the right to file a motion to disqualify Plaintiffs' counsel Neal Lewis. Given the disposition of the motions for summary judgment, the Defendants' Motion will be DENIED as moot.

### CONCLUSION

Based on the foregoing, Plaintiffs' Motion to Voluntarily Dismiss Certain § 1983 Claims (Docket # 127) is GRANTED. Defendants' motion for summary judgment

(Docket # 74) is GRANTED as to Plaintiffs' Clean Water Act claims and is GRANTED as to Plaintiff's § 1983 due process claim. Defendants' Supplemental Motion for Summary Judgment (Docket # 123) is GRANTED as to Plaintiffs' § 1983 Fifth Amendment takings claim. Plaintiffs' motion for partial summary judgment (Docket # 81) is DENIED. Defendants' Motion to Reserve Right to Disqualify Neil Lewis (Docket # 113) is DENIED as moot. Defendants' Motion to Strike Affidavits of W. Lewis, S. Lewis and 2nd Affidavit of G. Lewis (Docket # 115) and Defendants' Motion to Strike Refiled Notice of Objections to Statement of Genuine Issues (Docket # 118) are DENIED.

The Clerk is hereby directed to enter judgment in favor of the Defendants.

---

Defendants knew the full extent of the sediment that would be drawn into the Fawn River at the time they began the draw-down.

Thus, this court finds none of these facts aids the Plaintiffs in establishing more than negligent conduct.